JAMES HOLL (CA Bar No. 177885)
jholl@cftc.gov
COMMODITY FUTURES TRADING COMMISSION
1155 21st Street, N.W.
Washington, DC 20581
(202) 418-5311 / (202) 818-3117 (fax)

LOCAL COUNSEL:
DANIELLE A. STOUMBOS (CA Bar No. 264784)
Danielle.Stoumbos@dfpi.ca.gov
CALIFORNIA DEPARTMENT
OF FINANCIAL PROTECTION & INNOVATION
320 West Fourth Street, Suite 750
Los Angeles, California 90013
(213) 503-2046 / (213) 576-7181 (fax)

## THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION & INNOVATION, and STATE OF HAWAII, DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS, SECURITIES ENFORCEMENT BRANCH, <br><br> Plaintiffs, <br><br> v. <br><br> RED ROCK SECURED, LLC, and SHADE JOHNSON-KELLY a/k/a SEAN KELLY, and ANTHONY SPENCER, <br><br> Defendants. | Civil Action No. 2:23-CV-03680 <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Commodity Futures Trading Commission ("CFTC" or "Commission"), California Department of Financial Protection & Innovation ("DFPI"), and State of Hawaii, Department of Commerce and Consumer Affairs, Securities Enforcement Branch ("SEB") (hereinafter the DFPI and SEB are referred to collectively as "the States"), by and through their undersigned attorneys, hereby allege as follows:

## I.    SUMMARY

1.    From at least November 2019 and continuing through at least February 2022 ("Relevant Period"), Red Rock Secured, LLC ("Red Rock"), Shade Johnson-Kelly a/k/a Sean Kelly ("Kelly"), and Anthony Spencer ("Spencer") (collectively "Defendants") engaged in a scheme to defraud people throughout the United States, including in this District, in California, and in Hawaii.

2.    Defendants made knowing or reckless misrepresentations and omissions to prospective and existing customers intended to induce them to purchase precious metals from Red Rock, in particular silver and gold Canadian Red-Tailed Hawk ("RTH") coins.  Defendants knowingly or recklessly misled these customers into believing that Red Rock's mark-up on these coins—i.e., the difference between what Red Rock paid to acquire the RTH coins and the price Red Rock charged its customers for those coins—would fall between either 4% to 29% or, in some instances, 1% to 5%.  In reality, Red Rock routinely and repeatedly charged mark-ups ranging from approximately 100% to 130% on the RTH coins, and did not tell customers the actual mark-ups charged.

3.    Defendants' misrepresentations and omissions also pertained to, among other things:  Red Rock's relationship with various mints, in particular the Royal Canadian Mint ("RCM") which produced the RTH coins; pricing and mintage of the RTH coins; "bonuses" and "discounts" purportedly offered to Red Rock's customers; and the purported "retail/market value" of the customers' RTH coin purchases.

4.      During the Relevant Period, Defendants convinced hundreds of customers to transfer funds in their tax-deferred retirement accounts, including individual retirement accounts ("IRAs"), 401(k) plans, and the U.S. Government Thrift Savings Plan ("TSP"), and use those funds to purchase precious metals from Red Rock through self-directed IRAs ("SDIRAs").  Defendants also solicited and accepted funds from hundreds of customers to purchase precious metals from Red Rock using non-retirement funds.

5.      As a result of the misrepresented and undisclosed mark-ups Red Rock charged on the RTH coins, customers generally and almost immediately suffered substantial losses on their purchases.  During the Relevant Period, Defendants fraudulently solicited approximately $61.8 million from approximately 959 customers for the purchase of RTH coins.  Red Rock charged its customers approximately $34.4 million in mark-ups on those purchases, as part of Defendants' fraudulent scheme.

6.      In an effort to conceal and perpetuate Red Rock's fraud, Defendants also misled customers about the value of the RTH coins they purchased by falsely claiming, *inter alia*, that the "retail/market value" of the coins was far higher than their precious metal content.  In addition, Spencer provided customers with periodic updates in which he represented that the "current retail value" of the customers' precious metal was based on data provided to Red Rock by the RCM when, in fact, the RCM did not provide any such data to Red Rock.

7.      By virtue of this conduct, and as more fully set forth below, Defendants have engaged, are engaging, and/or are about to engage in violations of:  Section 6(c)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022); Sections 25230, 25235, and 29536 of the California Corporation Code; and Sections 485A-501(a)(2) and 485A-603.5 of the Hawaii Revised Statutes.

8.     The acts, misrepresentations, omissions, and failures of Kelly, Spencer, and other officers, employees, and agents of Red Rock occurred within the scope of their employment, agency, or office with Red Rock.  Therefore, Red Rock is liable for all of these acts and practices pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2022).

9.     During the Relevant Period, Kelly served as Red Rock's chief executive officer.  In that role, Kelly controlled Red Rock, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Red Rock's conduct alleged in this complaint.  Therefore, Kelly is liable for the acts of Red Rock described herein pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b).

10.     Accordingly, pursuant to Sections 6c and 6d(1) of the CEA, 7 U.S.C. §§ 13a-1, 13a-2(1), the CFTC and the States bring this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the CEA and CFTC Regulations, and to enjoin them from engaging in any commodity-related activity, as set forth below.  The States separately allege violations of state law based on the conduct described herein.  Plaintiffs also seek civil monetary penalties and remedial ancillary relief, including, but not limited to, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive and other relief against any person whenever it appears to the CFTC that such person has engaged, is

engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

12.     Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1), authorizes the States to bring a suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorney General and/or Securities Administrator of a State, or such other official that a State may designate, that the interests of the residents of the State have been, are being, or may be threatened or adversely affected because of violations of the CEA or CFTC Regulations.  The acts and omissions in violation of the CEA occurred within each of the States.  Customers from both States were materially and substantially harmed by Defendants' violations of the CEA, CFTC Regulations, and various provisions of California and Hawaii state law.

13.     This Court has supplemental and pendent jurisdiction over the State-law claims of the States pursuant to 28 U.S.C. § 1367(a).

14.     Venue lies properly in this District pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e), because Defendants transacted business in this District, and certain transactions, acts, practices, and courses of business in violation of the CEA and CFTC Regulations occurred, are occurring, or are about to occur within this District, among other places.

### III.    PARTIES

#### A.   Plaintiffs

15.     **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the CEA and CFTC Regulations promulgated thereunder.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

16.     **California Department of Financial Protection and Innovation**: Headed by a Commissioner, the DFPI has jurisdiction over (i) the offer and sale of commodities and commodity contracts in California under the California Commodity Law of 1990 ("CCL") (Cal. Corp. Code § 29500-29567); (ii) investment advisers under the Corporate Securities Law of 1968 ("CSL") (Cal. Corp. Code § 25000-25707); and (iii) the offer and sale of securities under the CSL.  The Commissioner of the DFPI is the California securities administrator.  The DFPI maintains its principal office at 2101 Arena Boulevard, Sacramento, California 95834.

17.     **State of Hawaii, Department of Commerce and Consumer Affairs, Securities Enforcement Branch**:  The Commissioner of Securities, by and through the Securities Enforcement Branch, is vested with the authority to administer and enforce the provisions of Chapter 485A of the Hawaii Revised Statutes, known as the Uniform Securities Act (2002), and the rules adopted and orders issued thereunder.  The SEB's office is located at 335 Merchant Street, Room 205, Honolulu, Hawaii 96813.

**B.   Defendants**

18.     **Red Rock Secured, LLC** is a Nevada limited liability company formed on January 12, 2010.  On November 4, 2016, Red Rock registered with the California Secretary of State as a foreign limited liability company, with its principal office located at 898 N. Pacific Coast Highway, Suite 440, El Segundo, California.  Red Rock has never been registered in any capacity with the Commission, the DFPI, or the Hawaii Commissioner of Securities.

19.     **Shade Johnson-Kelly a/k/a Sean Kelly** is Red Rock's President and Chief Executive Officer ("CEO").  Kelly is one of two signatories on Red Rock's bank accounts.  During the Relevant Period, Kelly held an 80% ownership share in Red Rock, controlled its day-to-day operations, supervised (directly and indirectly) its employees and agents, and made hiring and firing decisions on behalf of the

company. Kelly has never been registered in any capacity with the Commission, the DFPI, or the Hawaii Commissioner of Securities. Kelly resides in Los Angeles, California.

20. **Anthony "Tony" Spencer** was a Senior Account Executive at Red Rock during part of the Relevant Period. During at least a portion of the Relevant Period, Spencer served as Red Rock's Director of Account Services. Spencer has never been registered in any capacity with the Commission, the DFPI, or the Hawaii Commissioner of Securities. Spencer resides in Los Angeles, California.

## IV. FACTS

### A. Overview: Red Rock Defrauded Customers Through Misrepresentations and Omissions About the RTH Coins

21. As alleged in detail in Sections G through J below, Defendants defrauded customers through a series of misrepresentations. Most egregiously, Defendants grossly misrepresented to customers the mark-up Red Rock would charge on the RTH coins, while omitting to tell them the actual mark-ups Red Rock charged. Defendants also misrepresented Red Rock's relationship with the RCM, as well as the pricing and mintage of the silver RTH coin. In addition, Spencer misrepresented discounts and bonuses purportedly granted to customers. Finally, Defendants misrepresented the "retail/market value" or "current retail value" of customers' RTH coins.

22. Language in the "Transaction Agreement" Red Rock provided to customers advised that for certain "premium" precious metals, including the RTH coins, "[t]he difference between the Purchase Price Client pays for Products under a Purchase Order and the price that Red Rock actually pays for the Products purchased by Client under such Purchase Order" ranged from 4% to 29%. In reality, Red Rock routinely charged mark-ups of between approximately 100% and 130% on the RTH coins.

23. At Defendants' suggestion, the vast majority of its customers purchased RTH coins, which Red Rock advertised as "premium products" rather than "common bullion" products. Despite this fact, when asked about Red Rock's charges or mark-up, Red Rock sales personnel, including Spencer, routinely told customers that Red Rock charges 1% to 5 % "above our costs on common bullion" products. In reality, as noted above, Red Rock charged vastly higher mark-ups on the RTH coins.

24. To create the illusion of a pricing advantage to the customers, Red Rock sales personnel routinely told customers that Red Rock had a "direct relationship" with the RCM and could, therefore, "pass the savings" on to Red Rock's customers. Spencer also told customers that the RCM set the price of the RTH coins. These statements were false. Red Rock did not have a direct relationship with the RCM and it was Kelly, not the RCM, who determined the prices of the RTH coins. In addition, Spencer also routinely told customers that they were paying "discounted" prices or receiving "bonus" metal. In reality, most customers received no or minimal discounts or bonuses.

25. To further foster the illusion of value in the RTH coins, Spencer told at least one customer that the RTH coins were of limited mintage. In fact, there was no mintage limit. To that same end, Defendants represented that the RTH coins possessed value substantially beyond their metal content. In reality, both the "true retail/market value" touted by Red Rock and, to an even greater degree, the "current retail value" updates provided by Spencer, substantially overstated the actual value of the RTH coins.

26. Immediately below, the allegations of Sections B through F put Defendants' fraudulent misrepresentations and omissions in context by detailing Red Rock's precious metals business, sales pitch, products, pricing, and the origin of the RTH coins, as well as Red Rock's RTH commission and sales figures.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

**B.   Red Rock's Precious Metals Business**

27.     Red Rock is a precious metals retailer, meaning it sells various types of precious metals products (e.g., bars, rounds, and coins) directly to members of the public.

28.     Precious metals are commodities under Section 1a(9) of the CEA, 7 U.S.C. § 1a(9).

29.     Typically, coins are produced by a mint which sells them to precious metals distributors.  The distributors, in turn, sell the coins to precious metals wholesalers.  The precious metals wholesalers then sell the coins to precious metals retailers, such as Red Rock.  Each of these transactions includes a mark-up charged by the seller.

30.     During the Relevant Period, Red Rock purchased all of its precious metals products from a single wholesaler ("Wholesaler 1").  Red Rock has never purchased coins or other precious metals products directly from the RCM or any other mint.

31.      For customers using tax-deferred or other retirement funds to purchase precious metals, Red Rock followed a three-step process:  First, Red Rock representatives assisted their customers in establishing a SDIRA and transferring existing retirement funds into the newly-established SDIRA.  Second, Red Rock purchased precious metals for its customers using those SDIRA funds.  Third, Red Rock facilitated the transfer of the newly-purchased metals to a depository or, in some cases, directly to the customer.

**C.   Red Rock's Sales Pitch**

32.     Red Rock's website explained Red Rock's mission as follows:  "Most people are worried about losing money in their retirement accounts.  At Red Rock Secured we convert that money into physical gold & silver so they can enjoy a worry-free retirement."  Promotional materials Red Rock provided to prospective

customers–often styled as "Guides" or "Playbooks"–touted precious metals IRAs as a means to "protect your retirement" or "preserve or potentially even grow your retirement wealth."

33. Kelly directed Red Rock sales personnel to emphasize these points in speaking with customers:

> At Red Rock Secured we know you want to be worry free. In order to do that, you need to protect your retirement savings. The problem is you can wake up and half your retirement could be gone which makes you feel powerless.
>
> We believe that you deserve to be confident that everything you have worked for will still be there tomorrow. We understand, in the last recession we saw too many Americans lose too much which is why we for over a decade have worked with our clients to protect their retirement savings by investing in gold and silver.

34. "Trust" was also a common theme that Defendants promoted on Red Rock's website, in its promotional materials, and in its training materials for sales staff. Such statements included:

> "Trust Comes First."
>
> "We are committed to building relationships. All our client relationships are built on trust."
>
> "Red Rock is dedicated to protecting your retirement – a company built on trust, expertise, and performance."
>
> "All our client relationships are built on trust - this is an integral part of how we do business and informs all of our actions. We trust one another as we build trust with our clients."

35. In reality, Red Rock's sales practices did not, in fact, "protect" customers' retirement savings. Instead, by virtue of the various repeated misrepresentations alleged below, Red Rock betrayed the "trust" it repeatedly touted as integral to its business and informing all of Red Rock's actions.

36. As part of its sales pitch, Red Rock also emphasized to prospective customers that certain categories of precious metals products are on the "CUSIP list" (Committee on Uniform Security Procedures) and thus are "trackable" by the

government, while other "non-CUSIP" products, including the RTH coins, are "private and non-trackable."  Red Rock told prospective customers that the CUSIP list allows "financial institutions and government entities to track and identify financial products."

37.    Red Rock also told prospective customers that "[b]y tagging, tracking, and identifying precious metals assets, CUSIP enables financial institutions and the government to *monitor* precious metals holdings and, of course, the investors who hold them" (emphasis in original).  As such, according to Red Rock, "CUSIP metals are often referred to as 'public' gold or silver."

38.    According to Red Rock, "Non-CUSIP metals act in nearly the opposite fashion—providing the highest levels of security and authenticity while maintaining anonymity."  As such, "Non-CUSIP metals are often called 'private' and/or 'premium' metals."

**D.   Red Rock's Products**

39.    Red Rock generally categorized its precious metals products as either "common bullion" products or "premium" products.  The "common bullion" category included comparatively less-expensive, lower-commission products such as metal bars and rounds.  In contrast, the "premium" category included comparatively more-expensive, higher-commission products such as the RTH coins.

40.    Promotional material Red Rock provided to prospective customers further categorized its precious metal offerings or "assets"  as "common bullion," "monetized bullion," or "monetized bullion (limited quantity)."

41.    Red Rock's promotional material steered customers toward its monetized bullion (limited quantity) products.

**1.  "Common Bullion"**

42.    According to Red Rock's promotional material, "[b]ars and rounds are the most common form of bullion.  Common in that investors who are new to

precious metals investing tend to gravitate to bars and rounds based on inexperience and lack of knowledge concerning other available options."

43.   Red Rock told prospective customers that bars and rounds offer "no monetary value other than the value of the metal based on weight."  According to Red Rock, "[t]his can affect the long-term profit and growth of the asset and its eventual resaleability since it does not provide the functionality of a currency piece as Monetized Bullion does."

44.   Red Rock emphasized to prospective customers that common bullion assets are on the CUSIP list and thus trackable by the government.

### 2.  "Monetized Bullion"

45.    According to Red Rock's promotional material, "monetized bullion" refers to coins produced from gold, silver, or other precious metals "that have been or are used as a medium of exchange."

46.   Red Rock told prospective customers that monetized bullion provides monetary value beyond the weight of the metal itself:  "Because Monetized Bullion provides monetary value and functionality as a currency piece, whereas common bullion assets like bars and rounds do not, long-term growth and profitability can prove much greater as investors seek to acquire assets that enable them to cover all their bases—as an investment as well as a potential crisis instrument should they need to use their metal as an alternative to the dollar."

47.   Red Rock emphasized to prospective customers that monetized bullion assets, like common bullion assets, are on the CUSIP list and thus trackable by the government.

### 3.  "Monetized Bullion (Limited Quantity)"

48.   According to Red Rock's promotional material, "monetized bullion (limited quantity)" assets are similar to monetized bullion assets in that they are

produced by government mints, they may be used as media of exchange, and they function "as an investment and a potential crisis instrument."

49.     Red Rock advised prospective customers that "[w]hile there are many similarities between" standard monetized bullion and monetized bullion (limited quantity), a "key differentiator that contributes to how the assets appreciate in value in the long term is mintage population."  Standard monetized bullion assets "are produced in significantly higher quantities," as compared to monetized bullion (limited quantity) assets.

50.     According to Red Rock: "Whereas Standard Monetized Bullion can increase in price based on just two factors—intrinsic value and monetary value—the additional variable of limited supply size can cause Monetized Bullion (Limited Quantity) to move in value faster."

51.     Red Rock emphasized to its customers that, in contrast to common bullion and standard monetized bullion assets, monetized bullion (limited quantity) assets are *not* on the CUSIP list and thus *not* trackable by the government.

52.     Red Rock told customers that monetized bullion (limited quantity) was preferable to common bullion and standard monetized bullion:  "More often than not, Monetized Bullion (Limited Quantity) is the preferred option when building a precious metals portfolio for long-term profit, growth, and security."  And, "[t]hese assets are for savvy investors who want to protect their portfolios with precious metals through maximizing the value of their investment."

53.     Red Rock classified and promoted the RTH coins as monetized bullion (limited quantity).

**E.   Red Rock's Pricing**

54.     Red Rock advised its customers that common bullion products "are priced for the most part in accordance with the value of the precious metal they contain."  In contrast, premium products, including the RTH coins, "are priced at a

premium above the value of the precious metals they contain." According to Red Rock, "[t]his premium is based on various factors, including, but not limited to, speculative interest, collector and investor demand, available supply, industry promotions, perceived value and economic conditions."

55. In its promotional literature, Red Rock further explained how its products were priced: "[A]ll orders are based off of current market prices, also referred to as spot price. Spot price is a common industry wide standard used to determine the value of one ounce of gold or silver. Different assets have different premiums above spot price."

56. In the precious metals industry, the spot price refers to the price per ounce of metal available for immediate delivery on any one of a number of exchanges around the world where precious metals, including silver and gold, are traded each day.

57. "Melt value" (or "melt") refers to the price of a given quantity of metal based on the "spot" (or per ounce) price. For example, if the spot price of silver is $16.00 per ounce, the melt value of a half-ounce silver coin would be $8.00.

58. The prices Red Rock paid Wholesaler 1 to acquire the RTH coins were directly tied to the spot prices of gold and silver. Internally, Red Rock referred to the prices it paid to Wholesaler 1 as its "cost of goods sold."

59. In contrast, the prices Red Rock charged its customers for the RTH coins were not based directly on the spot price. Rather, Red Rock based the prices it charged customers on Red Rock's "cost of goods sold."

60. Red Rock's mark-up on metals sold to customers was the difference between "its cost of goods sold" and the price Red Rock charged its customers for those same metals.

61. Kelly determined what mark-ups Red Rock charged for the assets it sold to customers. For "common bullion" products, Red Rock charged its customers

mark-ups of between approximately 3% to 5% above its cost of goods sold.  For "premium" products, including the RTH coins, Red Rock charged its customers mark-ups of up to approximately 130% above its cost of goods sold.

### F.  Red Rock's Exclusive Premium Coin:  The Canadian Red-Tailed Hawk

62.     In late 2019, Wholesaler 1 offered Red Rock an opportunity. Wholesaler 1 agreed to sell two coins—the half-ounce silver RTH coin and the one-tenth ounce gold RTH coin—to Red Rock exclusively.

63.     Both the initial silver and gold RTH coins—and later a quarter-ounce gold RTH coin—were produced by the RCM and sold to one of its U.S. distributors. That distributor, in turn, sold the RTH coins to Wholesaler 1 exclusively.  Wholesaler 1 then sold them to Red Rock exclusively.

64.     Wholesaler 1 advised Red Rock that there was no mintage limit on the RTH coins.  Effectively, the RCM would produce as many RTH coins as Red Rock could sell.

65.     Despite the absence of a mintage limit, Red Rock misleadingly classified and promoted the silver and gold RTH coins as "monetized bullion (limited quantity)."

66.     Wholesaler 1 sold Red Rock half-ounce silver RTH coins for "$2.95/coin over melt."  As Wholesaler 1 explained to Kelly: "If the silver spot [price] is $18.00/oz, your cost is $9.00 + $2.95 = $11.95" per coin.

67.     Wholesaler 1 sold Red Rock one-tenth-ounce gold RTH coins for "15% over melt."  As Wholesaler 1 explained to Kelly: "If the gold spot [price] is $1500/oz, your cost is $150.00 x 1.15 = $172.50 per coin."

68.     As noted above, Red Rock routinely and repeatedly charged mark-ups of between approximately 100% to 130% on the RTH coins.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

69.     During the Relevant Period, Defendants incentivized Red Rock sales staff to sell its "premium" products, particularly the RTH coins.  While sales of common bullion products typically entitled Red Rock's sales staff to a commission of 1% of the total purchase, the RTH coin sales carried an 8% commission.

70.     Beginning in January 2020, Spencer, who was consistently Red Rock's top salesperson, received 10% sales commissions on his sales of the RTH coins.

71.     Consistent with Red Rock steering customers toward "monetized bullion (limited quantity)," the RTH coins were Red Rock's bestselling products.  The silver RTH coin was by far Red Rock's single best seller during the Relevant Period, accounting for approximately 72% of Red Rock's total sales, while the second-best-selling gold RTH coins accounted for approximately 7% of total sales.  Together the silver and gold RTH coins accounted for approximately 79% of Red Rock's total sales during the Relevant Period.

72.     During the Relevant Period, Red Rock sold more than 1.8 million RTH coins (1,799,404 silver RTH coins and 10,470 gold RTH coins).

73.     In total, approximately 959 customers paid Red Rock approximately $61.8 million to purchase RTH coins.

**G.  Defendants Misrepresented and Omitted Material Information About Red Rock's Mark-Ups**

**1.  Red Rock's Transaction Agreement Misrepresented Its Mark-Ups**

74.     Red Rock required its customers to sign a Transaction Agreement in order to purchase precious metals from Red Rock.

75.     Red Rock sales staff, including Spencer, routinely told customers to refer to their Transaction Agreement to answer any questions the customers might have.

76.     During the Relevant Period, none of the Transaction Agreements signed by Red Rock's customers disclosed Red Rock's actual mark-ups on the products it sold.

77.     In fact, for almost the entire Relevant Period, the Transaction Agreements did not even include the term "mark-up."

78.     Rather, prior to December 2021, the only apparent reference to Red Rock's mark-ups in Red Rock's Transaction Agreements consisted of the following language under the heading "Bid/Ask Spread":

> The difference between the Purchase Price Client pays for Products under a Purchase Order and the price that Red Rock actually pays for the Products purchased by Client under such Purchase Order is known as the "spread" and it is stated as a percentage of the Purchase Price paid by the Client.

79.     One version of this "Bid/Ask Spread" provision informed customers that the "spread" on Red Rock's "premium … coins typically ranges, between 4% and 29%."  A second version noted a typical range of "5% for CUSIP assets and 29% for Premium/non-CUSIP assets."  As noted above, Red Rock characterized the RTH coins as both "premium" and "non-CUSIP."

80.     In December 2021, Red Rock revised its Transaction Agreement to include an explicit reference to "mark-up."  The "Bid/Ask Spread and Mark-Up" section in this revised Transaction Agreement included language strikingly similar to the opening sentence of the earlier "Bid/Ask Spread" language quoted above:

> "Mark-up" is the difference between the Purchase Price Clients pay for Products and the price that Red Rock pays for such Products.  The mark-up can range anywhere from 5% to 120% depending on the type of coin and the fair market value at the time.

81.     None of the Transaction Agreements in use during the Relevant Period specified the actual mark-ups Red Rock charged on any particular product sold by Red Rock, including the approximately 100% to 130% mark-ups on the RTH coins.

## 2. Spencer and Other Red Rock Sales Staff Misled Customers about the Mark-Ups

82.     Accounting for approximately 79% of Red Rock's total sales during the Relevant Period, sales of the RTH coins, which carried Red Rock's highest mark-ups, vastly outstripped Red Rock's "common bullion" product sales, which carried Red Rock's lowest mark-ups.

83.     Despite this fact, Red Rock sales staff, including Spencer, misleadingly told some customers that Red Rock charged 1% to 5% "above our costs on common bullion assets," even though the vast majority of customers purchased RTH coins, not common bullion assets.

84.     In fact, Red Rock sales staff were instructed to reference the 1% to 5% mark-up associated with Red Rock's common bullion products when customers or prospective customers questioned Red Rock's charges or fees.

85.     For example, responding to questions raised by Customer A in August 2020, Senior Account Executive X wrote: "Red Rock makes money from the purchase of the precious metals.  We charge 1-5% above our cost on all our common bullion assets.  The price includes free shipping and free insurance."

86.     A few weeks later, Spencer used the same language when confirming Customer A's purchase:

> **Customer A**:  Okay.  Yeah, I remember asking [Senior Account Executive X], you know, how you guys make your money and I guess you do it by your discounts you get from the mints.  Is that –
>
> **Spencer**:  We charge anywhere from – yeah, from the mints, exactly. Because we're not a retail shop.  We're an investment firm.
>
> **Customer A**:  Mm-hmm.
>
> **Spencer**:  So, we have a direct relationship with the mints.  We buy our metal in volume and we buy our metal in wholesale and we pass the savings on to you.  We charge anywhere from 1 to 5 percent above our cost on common bullion assets.

87.     Spencer referred to Red Rock's "common bullion" mark-up of 1% to 5% despite knowing, as he confirmed later in the same conversation, that Customer A purchased only "premium" products, specifically silver and gold RTH coins, which carried mark-ups of approximately 129% and 115%, respectively.

88.     Customer A paid Red Rock $149,705.00 for 3,245 silver and 60 gold RTH coins.  Red Rock charged mark-ups of approximately 129% on the silver RTH coins and approximately 115% on the gold RTH coins Customer A purchased.

89.     Spencer did not disclose to Customer A the actual mark-ups Red Rock charged Customer A on his silver and gold RTH coins.

90.     As a result of its misrepresented, undisclosed mark-up, Red Rock kept $83,595.50 of the $149,705.00 Customer A paid, while paying Wholesaler 1 only $66,109.50 for the RTH coins sold to Customer A.

91.     In February 2021, Senior Account Executive X referred to Red Rock's "common bullion" mark-up in response to a question from Customer B:

> **Customer B**: Ok. What's your mark-up on, when you buy the gold?
>
> **Senior Account Executive X**: Markup on gold, we charge between one to five percent above our cost on all our common bullion coins and bars, that's really aggressive, and it's free shipping and free insurance as well to the depositories.
>
> **Customer B**:  One to five.  How do you get the one?
>
> **Senior Account Executive X**:  I mean, it all depends on the assets themselves and the mints. Because obviously, supply and demand, if the mint's running out of something, they put out their price, so that's why we say one to five percent.  You can go with five percent being the worst on the common bullion assets.

92.     During the same conversation, Senior Account Executive X quoted prices for two one-ounce silver coins (the Canadian Maple Leaf and American Eagle) and silver rounds.

93.    Red Rock classified the one-ounce silver Canadian Maple Leaf, the one-ounce silver American Eagle, and one-ounce silver rounds as "bullion."  Red Rock charged a mark-up of 5% on the silver Canadian Maple Leaf, a 4% mark-up on the silver American Eagle, and a 4% mark-up on silver rounds.

94.    Customer B did not, however, purchase any of the "bullion" products referenced by Senior Account Executive X, and Red Rock did not charge a mark-up of 4% or 5%.  Instead, Customer B paid Red Rock $74,680.00 for 2,015 silver RTH coins.  Despite Senior Executive X quoting a mark-up of 1% to 5%, Red Rock charged  a mark-up of approximately 129% for the RTH coins Customer B purchased.

95.    Customer B's spouse, Customer C, likewise paid Red Rock $74,680.00 for 2,015 half-ounce silver RTH coins.  Red Rock charged a mark-up of approximately 129% on the RTH coins Customer C purchased.

96.    When Spencer called Customers B and C to confirm their purchases, he compared the half-ounce silver RTH coin which Customers B and C were purchasing to the one-ounce silver Canadian Maple Leaf:

> **Customer B**: Just to be clear … what coins are you buying?
>
> **Spencer:** These are the half-ounce silver Canadian Red Tail Hawk, non-CUSIP list assets …
>
> **Spencer**: So, if you're familiar with the Canadian Maple Leaf, for example –
>
> **Customer B**: Yes, I showed that out of your book to her.
>
> **Spencer**:  Ok, good.  Yeah, because ***these assets are exactly the same as those***, except the one-ounce – you know, and as we discussed, anything one ounce or larger is on the CUSIP list. So, if you prefer to stay with assets that are not on the CUSIP list you're not taxed twice for the same investment.  (Emphasis added.)
>
> **Customer B**: Right, that's what we prefer.

97.   Spencer did not disclose the approximately 129% mark-up Red Rock charged Customers B and C.  Nor did Spencer explain why two assets that he described as "exactly the same" (save for their CUSIP status) carried such different mark-ups, i.e., 5% for the silver Canadian Maple Leaf versus 129% for the half-ounce silver RTH coin.

98.   As a result of its misrepresented, undisclosed mark-ups, Red Rock kept $84,235.20 of the $149,360.00 Customers B and C paid, while paying Wholesaler 1 only $65,124.80 for the RTH coins sold to Customers B and C.

99.   In May 2021, Spencer again invoked Red Rock's "common bullion" mark-up of 1% to 5% when communicating with Customer D, this time omitting the "on common bullion assets" qualifier:

> As I indicated yesterday, your fee, which is a one-time fee, is 1.83%.  If you're moving 110k for example, your fee is $1,830. Red Rock charges 1-5% above its cost from the mint.  That range is adjusted accordingly based on the investment amount.

100.   Customer D paid Red Rock $149,624.20 for 3,990 silver RTH coins (excluding 10 silver RTH coins provided at no charge).  Contrary to Spencer's earlier assertion, Red Rock charged a mark-up of approximately 129%, not a "fee" of 1.83%.

101.   When Spencer called Customer D to confirm his purchase, Defendant Spencer did not disclose the 129% mark-up Red Rock charged Customer D.

102.   As a result of its misrepresented, undisclosed mark-up, Red Rock kept $84,224.20 of the $149,624.20 Customer D paid, while paying Wholesaler 1 only $65,400.00 for the RTH coins sold to Customer D.

103.   In February 2021, Customer E asked Senior Account Executive Y: "How does your … fee thing work?  I noticed in that book it says there is no fees [sic], but you guys [have] got to make money somewhere, somehow."  Senior Account Executive Y responded:

You are absolutely right, we are not a non-profit.  We are definitely a for-profit company.  The way that we make money is that we have a mark-up on the coins.  So, we essentially just make money one time, and one time only.  So, what will happen is that just like any business, we're buying at wholesale.  So, for example, let's just use a Silver American Eagle, for example.  We're buying it at, let's say, $25.00; we're selling it at $26.50.  So, that $1.50 markup on that coin is where we make our money.

104.    As noted above, Red Rock classified the Silver American Eagle coin as "bullion," carrying a 4% mark-up.  Red Rock sold only 1,307 Silver American Eagle coins in 2020, and 249 in January 2021.  As a point of comparison, Red Rock sold more than 69,000 silver RTH coins in January 2021 alone.

105.    Following her conversation with Senior Account Executive Y, Customer E paid Red Rock $19,679.85 for 505 half-ounce silver RTH coins.  Put differently, Customer E paid Red Rock $38.97 per coin, while Red Rock purchased those same coins from Wholesaler 1 for $16.98 per coin.

106.    In contrast to the $1.50 mark-up example cited by Senior Account Executive Y, Red Rock charged a mark-up of $21.99 per coin, or approximately 129%, on the RTH coins Customer E purchased.

107.    When Spencer called to confirm Customer E's purchase, he did not disclose the 129% mark-up that Red Rock charged.

108.    As a result of its misrepresented, undisclosed mark-up, Red Rock kept $11,104.95 of the $19,679.85 Customer E paid, while paying Wholesaler 1 only $8,574.90 for the RTH coins sold to Customer E.

109.    In total, as a result of Red Rock's misrepresented, undisclosed mark-ups, Red Rock kept approximately $34.4 million of the approximately $61.8 million paid by customers for RTH coins, while paying Wholesaler 1 only approximately $27.4 million for RTH coins.

110.    Defendants knew, or were reckless in not knowing, that their communications with customers about Red Rock's mark-ups on RTH coins—

1  including the examples above—contained material misrepresentations, half-truths,
2  and omissions.

3  **H.  Defendants Misrepresented Red Rock's Relationship with the**
   **Mints, the RCM's Role in Pricing the RTH Silver Coin, and**
4  **"Limited Mintage" of the Silver RTH Coin**

5  **1.  Misrepresentations About Red Rock's Relationship with**
6  **the Mints**

7      111.   Spencer and other Red Rock representatives routinely told customers
8  and prospective customers that Red Rock had a "direct relationship" with "the
9  mints," when, in fact, no such relationships existed.

10     112.   In addition, Spencer repeatedly told customers and prospective
11 customers that Red Rock was not a "retail company," when, in fact, it was a retail
12 company.

13     113.   For example, in a July 2021 follow-up email to Customer F, Spencer
14 touted the purported benefits of Red Rock's "direct relationship" with the mints:

15         As we discussed previously, Red Rock Secured is not a retail
16         company/coin shop.  I would venture to guess that the other
           companies you've contacted fall more on the retail side of the
17         spectrum.  Retail companies do not have a direct relationship
           with the mints, the metal they provide to you must be secured
18         through a metals distributor, and as a result you end up paying
           much higher premiums for the same metal you could acquire
19         from Red Rock Secured for substantially less.

20         The benefit to you in working with Red Rock Secured is we are
           an investment firm, we have a direct relationship with the
21         mints, and therefore we are able to acquire the metal we provide
           to you at wholesale prices.

22         Our fee structure, as we discussed previously, is between 1%
23         and 5% on common bullion assets.  Comparatively, retail
           companies will charge upwards of 25% to 30%.

24         When acquiring metal through a retail company, investors pay
25         the retail company's markup, the metals distributor's markup,
           and the mint's markup.  You end up with substantially less
26         metal in your portfolio as a result.

27

28

114.   Spencer's email to Customer F above is riddled with false and misleading statements:  Red Rock never had a direct relationship with any mint; Red Rock was in fact a "retail company;" Red Rock had to secure its metals through a "metals distributor" just like other retail precious metals dealers; and all of the various "markups" referenced by Spencer were in fact paid by Red Rock's customers.

115.   Spencer also invoked Red Rock's purported "direct relationship" with "the mints" when confirming Customer A's purchase of silver and gold RTH coins: "So, we have a direct relationship with the mints.  We buy our metal in volume and we buy our metal in wholesale and we pass the savings on to you."

116.   Spencer also told at least one customer, Customer G, that Red Rock had "an exclusive relationship" with the RCM.

117.   Later that month, Customer G contacted Spencer to inquire about the price/value of his silver RTH coins:

> **Customer G**: I am not understanding how 111 1/2 oz Canadian red tailed hawks are worth $4,000 dollars. At about $27 an ounce that would come to 55.5 ounces x 27=$1498.5. Can you explain? Because I can buy the same thing from [a Red Rock competitor] for 26.7 and [sic] ounce.  Please let me know what happened here?

118.   In responding to Customer G, Spencer invoked Red Rock's purported "exclusive relationship" with the RCM, among other purported benefits of the RTH coins:

> **Spencer**: As we discussed, your assets are not on the CUSIP list and therefore are completely private with no tracking or serial number attached to them. They are also monetized, which means you can use them as legal tender if necessary. You can liquidate these assets privately, which is one of the main reason [sic] they are continuing to appreciate in value very quickly. The version that [the Red Rock competitor] provides is a one ounce coin produced in 2015. Anything 1 oz or larger is on the CUSIP list and is not a private asset. [The Red Rock competitor] does not have access to the 1/2 oz Canadian Red Tailed Hawk, as they are a retail company, *whereas Red Rock Secured has an exclusive relationship with the Royal Canadian Mint. As a result, your assets are worth considerably more* when you liquidate/sell them. Please let me know if you have any additional questions.  (Emphasis added).

119.   Contrary to Spencer's assertions, Red Rock did not have "a direct relationship with the mints" or an "exclusive relationship" with the RCM.  Rather, Red Rock bought all of the metal it sold to customers from Wholesaler 1.

120.   As another example, Senior Account Executive Y, responding to questions from a prospective customer, also referred to Red Rock's "direct" relationship with the mints:

> We see that directly because we're a direct wholesaler to the US Mint, the Canadian Mint, Perth, and Swiss Mints.  The way that we save our clients money is that there is no middleman. We buy directly from them and then pass the savings to you, so there's no additional markup … for someone in between that we have to buy it from.

121.   This statement was false.  Red Rock does not "buy directly from the mints."  Rather, Red Rock buys all of its metal from a "middleman"—Wholesaler 1—and pays that "middleman" an "additional markup."

### 2.   Misrepresentations About the RCM's Role in Pricing the Silver RTH Coin

122.   Spencer told at least one prospective customer that "the value of" the silver RTH coin was "set by the [Royal Canadian] mint, which has listed the coin for 49.99 CAD.  Therefore, re-salability, and ROI [Return On Investment] are exceptionally, comparatively much stronger than the common one oz. assets for the reasons we discussed."

123.   In fact, the RCM did not set the value of the RTH coins and did not list prices for them.  Rather, Kelly set the "value" (i.e., the price) at which Red Rock sold the RTH coins.

### 3.   Misrepresentations about Limited Mintage of the Silver RTH Coin

124.   Spencer misrepresented the mintage population of the silver RTH coin to at least one customer.

125.   On June 24, 2020, Customer H paid Red Rock $20,122.69 for 745 silver RTH coins.  Customer H paid Red Rock $27.09 per coin for the first 720 coins and somewhat lower prices for the remaining 25 coins.

126.   During a telephone conversation confirming Customer H's purchase, Spencer described the half-ounce silver RTH coins as "monetized bullion, limited quantity."

127.   The next day, Customer H contacted Spencer after she discovered one-ounce silver RTH coins selling for $16.46 each and various other half-ounce silver coins selling for $19.99 or $22.69 each, prices substantially lower than what Customer H paid Red Rock for almost all of the half-ounce silver RTH coins she purchased.

128.   Responding to Customer H, Spencer falsely suggested that there was a mintage limit for Red Rock's silver RTH coin which enhanced its value:  "Your coins were $27.09 when you bought them.  They are now trading at $27.35 per coin.  In addition to not being on the CUSIP list, the other main reason these coins are priced the way they are is *they are part of a limited mintage population—30k coins will be produced for 2020*."  (Emphasis added).

129.   In fact, just over two weeks earlier, Customers I and J purchased a total of 32,705 silver RTH coins from Red Rock.  Spencer confirmed both sales in a single confirmation call on June 9, 2020.

130.   Moreover, on the same day Spencer told Customer H that only 30,000 silver RTH coins would be produced for 2020, Wholesaler 1 advised Red Rock that: (i) there was no mintage limit on the RTH coins; and (ii) 446,360 silver RTH coins had been minted between November 2019 and June 26, 2020.

131.   Contrary to Spencer's representation to Customer H, 632,163 silver RTH coins were minted in 2020.

132.    Spencer and other Red Rock representatives knew, or were reckless in not knowing, that their communications with customers concerning Red Rock's relationship with the mints, the RCM's role in pricing the RTH coins, and limited mintage of the RTH coins, including those described above, contained material misrepresentations, half-truths, and omissions.

## I.    Spencer Misrepresented Red Rock's Purported Discounts and Bonuses Offered to Customers

133.    Spencer routinely misrepresented to customers that the metals they bought from Red Rock were "discounted."

134.    Typically, Red Rock charged customers full price for assets the customers purchased.  This price was known internally at Red Rock as the "retail ask" price.  Red Rock account executives, including Spencer, had continuous, real-time access at their desks to Red Rock's retail ask prices, as well as the spot prices of silver and gold.

135.    Red Rock account executives could, in their discretion, offer discounts from the retail ask price, with any such discounts coming out of their sales commission.  In addition, Red Rock offered a limited number of discounts when customer purchases reached certain thresholds.

136.    In confirming customers' purchases, Spencer routinely referred to the prices paid as "discounted" even when customers, including, for example, Customers D, H, and K, were charged the full retail ask price.

137.    On May 4, 2021, Spencer told Customer D:

> As I indicated yesterday, your fee, which is a one time fee, is 1.83%.  If you're moving 110k for example, your fee is 1,830 dollars.  Red Rock charges 1-5% above its cost from the mint. That range is adjusted accordingly based on the investment amount.  There are no fees when you sell the metal back to Red Rock.  You also receive the 15% bonus at 125k, 12-month Price Protection Plan, and No Fees for Life of the account with [the SDIRA custodian].

138.   As noted above, Customer D purchased 3,990 silver RTH coins from Red Rock, packaged in sixteen 240-coin boxes, seven 20-coin tubes, and one 10-coin tube.  Red Rock also provided Customer D with one 10-coin tube free of charge.

139.   Red Rock's full retail ask price for the silver RTH coins sold to Customer D was $37.58 per coin.

140.   Confirming the purchase, Spencer told Customer D that the sixteen boxes, seven 20-coin tubes, and one 10-coin tube he purchased were provided at a "discounted price."

141.   In fact, Red Rock charged its full retail ask price of $37.58 on all 3,990 of the silver RTH coins Customer D purchased.  None of those coins were sold to Customer D at a "discounted price."

142.   In addition, contrary to Spencer's representation, Customer D did not receive a "15% bonus."  In fact, the retail ask price for the ten coins Customer D received free of charge ($375.80) represents a "bonus" of less than one-half of one percent of the total Customer D paid Red Rock ($149,624.20).

143.   Customer H paid Red Rock $20,122.69 for 745 silver RTH coins, packaged in three 240-coin boxes, one 20-coin tube, and one 5-coin tube.

144.   Red Rock's full retail ask price for the 745 silver RTH coins sold to Customer H was $27.09 per coin.

145.   Confirming the purchase, Spencer told Customer H:  "Each box is provided at a discounted price of $6,502.56, subtotal $19,507.68."

146.   In fact, Red Rock charged Customer H its full retail ask price ($27.09 per coin) on every coin in each of the three 240-coin boxes.  Contrary to Spencer's representation, no discount was provided on the boxes of coins sold to Customer H.

147.   Customer K paid Red Rock $99,680.00 for 2,520 silver RTH coins, packaged in ten 240-coin boxes, five 20-coin tubes, one 10-coin tube, and two 5-coin tubes.

148.   Red Rock's full retail ask price for the silver RTH coins sold to Customer K was $39.58 per coin.

149.   When confirming the purchase, Spencer told Customer K that each box and tube of coins that he purchased was provided at a "discounted price."  In fact, Red Rock charged Customer K its full retail ask price of $39.58 per coin on 99.8% (2,515 of 2,520) of the silver RTH coins he purchased.  Contrary to Spencer's representation, only the last *five* coins were sold at a "discounted" price of $27.26 per coin.

150.   Spencer also told Customer K: "As I mentioned to you before the fee was 1.83%, the discount was 5%, so you're clearing an additional 3100, so the amount of metal that you're controlling in the account right now is" $103,117.

151.   In fact, contrary to Spencer's representation, Red Rock did not charge Customer K a 1.83% fee.  Rather, Red Rock charged a mark-up of approximately 130%.  Nor did Red Rock apply a 5% discount to Customer K's purchase.  Instead, the discount offered on only five of the 2,520 coins Customer K purchased totaled only $61.60.  As a percentage of Customer K's $99,680.00 purchase, $61.60 represented a discount of less than 0.1%.

152.   Spencer knew, or was reckless in not knowing, that his communications with customers regarding purported discounts and bonuses, including the examples discussed above, contained material misrepresentations, half-truths, and omissions.

**J.   Defendants Misrepresented the "Retail/Market Value" of Customers' RTH Coins**

153.   As part of the scheme to defraud, Defendants misrepresented the "retail value" of the RTH coins purchased by customers.

154.   Customers who used retirement assets to purchase the RTH coins received account statements from their SDIRA custodians showing account values significantly below the prices customers originally paid to Red Rock.  The SDIRA

account statements reflected significantly lower values for the RTH coins because the SDIRA custodians assessed the value of the accounts based on the melt value of the coins.

155.    Defendants rejected the lower valuations assessed by the SDIRA custodians and instead provided to customers what Defendants considered to be the actual "retail value" of the RTH coins at any given point in time.

156.    For example, beginning in at least February 2021, Red Rock's Transaction Agreement advised customers that:

> The "melt value," which represents the value of metal in its raw and unrefined state prior to it being converted into a finished tangible asset, is not indicative of your asset's true retail/market value. For example, "melt value" usually represents approximately ½ of your purchase value on Non-CUSIP assets. Conversely, the retail/market value of your assets is typically twice the melt value of Non-CUSIP assets due to the following factors that add additional value to your metals: market demand, investor demand, and supply and demand.

157.    When confirming customer purchases over the phone, Red Rock representatives, including Spencer, read from a script reiterating to customers that the "melt value" of the RTH coins represented only half of the RTH coins' "true retail/market" value:

> [T]he retail value of your product is different than its melt value. For example, the "melt value" represents the value of metal in its raw and unrefined state prior to being converted into a finished tangible asset. Therefore, the melt value is approximately one half of your purchase value on non-CUSIP assets. The other half is based on non-CUSIP investment values such as the value of comparable assets found through the applicable mint: market demand, investor demand, and supply and demand. As such, the "melt value" is not indicative of your asset's true retail/market value.

158.    Spencer routinely addressed the purported distinction between "melt" or "assessed" value on the one hand and "retail/market" value on the other hand with Red Rock customers.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

159.   In at least one instance, Spencer addressed the issue as part of regular updates he provided to customers purporting to show the current "retail value" of their precious metals.

160.   For example, on August 18, 2021, Customer L paid $99,740.00 to Red Rock.  Two days later, Spencer sent Customer L a "data overview" stating that the "current retail value" of his silver RTH coins had risen to $100,014.58.

161.   According to Spencer, the $100,014.58 "current retail value" of Customer L's silver RTH coins broke down as follows:

       INVESTOR DEMAND = 28% ($28,004.08)

       SUPPLY AND DEMAND = 26% ($26,003.79)

       MARKET DEMAND = 26% ($26,003.79)

       SPOT = 20% ($20,002.92)

162.   Contrary to the representations in Red Rock's Transaction Agreement and confirmation script that melt value accounted for approximately one half of purchase value, Spencer told Customer L that the spot or melt value accounted for less than one quarter of the "current retail value" of Customer L's RTH coins.

163.   Spencer also stated that the overview incorporates "all four factors"—investor demand, market demand, supply and demand, and spot (i.e., melt value)—"provided by the Royal Canadian Mint by percentage and corresponding dollar amount."

164.   In this overview and at least four others provided to Customer L, Spencer referred to the purported current retail account information as "baseline data provided by the Royal Canadian Mint."

165.   The following month, Customer L inquired about the disparity between the value of his RTH coins as reported by his SDIRA custodian ($32,000) and the amount of money he paid to Red Rock ($99,740,00):

**Customer L:** Mornin, looking at [my SDIRA custodian statement], the balance is only showing 32 k As a balance with 0 pending. Looking to see where the rest is?

**Spencer:** [A]s we've discussed, that is the assessed value, not the retail value. [Your SDIRA custodian] and all other custodians can only report the assessed value because they do not buy or sell metal. What I have been sending you weekly is the retail value.

**Customer L:** I did not buy 32 k assets worth of silver I purchased 100 k, worth of silver and feel very cheated at this time! Make it right!

**Spencer:** [W]hat you're seeing is the melt value, what the metal is before it's been taken out of the ground. [Your SDIRA] and all custodians, under the 1997 Tax Payers Relief Act, can only report melt because custodians do not buy or sell metal. We've covered this several times before, which is why I have been sending you the weekly review so you have an accurate accounting of the value of the account.

166.   In similar messages to other Red Rock customers, Spencer provided retail account values purportedly attributable to the "four factors provided by the Royal Canadian Mint." For example:

In an "account update" for Customer D: "Here is a breakdown of the data as provided by the Mint."

In a "weekly overview" for Customer M: "Your current retail value (baseline data provided by the Royal Canadian Mint) is 199,254.26."

In a "current retail value" update for Customer N, who purchased silver RTH coins: "The current retail value is 27,214.29. The data that helps to inform the value of the investment—75% of which—is provided by the mint."

167.   In reality, both the "true retail/market value" touted by Red Rock and, to an even greater degree, the "current retail value" updates provided by Spencer substantially overstated the actual value of the RTH coins.

168.   In fact, on at least two occasions, Kelly and Spencer were made aware of silver RTH coins being resold at prices substantially below the prices charged by Red Rock. In September 2020, Kelly and Spencer learned that some silver RTH coins were offered for sale by a Canadian website unconnected to Red Rock. In October

1  2020, a prospective customer alerted Spencer that Red Rock was charging "more than
2  double what they are selling for in Canada."

3      169.   Reacting to RTH coins being offered for substantially lower prices in
4  September 2020, Kelly told Wholesaler 1:  "[T]his is freaking me out.  What is this?"
5  In October 2020, Kelly told Wholesaler 1 and Red Rock's vice president of finance:
6  "Guys, this is KILLING our deals."  (Emphasis in original.)

7      170.   Moreover, contrary to Spencer's repeated representations, the RCM did
8  not provide data concerning the purported "current retail value" of the RTH coins.

9      171.   Defendants knew, or were reckless in not knowing, that their
10  communications with customers regarding purported "true retail/market value" and
11  "current retail value," including those described above, contained material
12  misrepresentations, half-truths, and omissions.

13  **K.   Kelly Acted as a Controlling Person of Red Rock**

14      172.   During the Relevant Period, Kelly owned an 80% share of Red Rock and
15  served as Red Rock's CEO.  The other two owners only provided capital to Red
16  Rock.  Neither of them worked for Red Rock or played any role in Red Rock's day-
17  to-day operations.

18      173.   Kelly was one of two signatories on Red Rock's bank accounts.  The
19  other signatory was Red Rock's Vice President of Finance who was hired by and
20  reports to Kelly.

21      174.   Kelly had discretion to take distributions from Red Rock and Red Rock
22  paid some of his personal expenses directly.

23      175.   Kelly was responsible for hiring Red Rock staff, including Red Rock's
24  director of sales, as well as Spencer and at least one other long-tenured senior account
25  executive.  Kelly also led Red Rock's weekly sales meetings.

176.    Kelly determined the mark-ups Red Rock charged for its "premium" coins, including the RTH coins, as well as the commissions Red Rock paid its sales staff.

177.    Kelly was responsible for determining what Red Rock sales staff told customers or prospective customers about mark-ups and fees.

178.    On at least some occasions, Kelly reviewed the recorded calls of Red Rock sales staff and provided written guidance about what sales staff could or should tell prospective customers.

179.     Kelly did not act in good faith or knowingly induced Red Rock's fraudulent acts.

L.    **Allegations Specific to Claims Brought by the State of California: Red Rock Acted from the State of California as an Unregistered Investment Adviser and Defendants Engaged in Fraud**

180.    The laws of the state of California govern the registration of Investment Advisers ("IAs").

181.    The laws of the State of California also prohibit (1) fraud in connection with investment advisory services, and (2) fraud in connection with the offer, purchase, or sale of commodities and commodity contracts.

182.    During the Relevant Period, Defendants engaged in an aggressive advertising campaign over various channels including phone solicitations, Red Rock's website, direct marketing emails, and advertisements in third party emails and newsletters.  Defendants used scare tactics to convince prospective customers to transfer funds, including funds from liquidating securities, in their tax-deferred retirement accounts, including IRAs, 401(k) plans, and the U.S. Government TSP ("Qualified Retirement Savings") to purchase precious metals, including the RTH coins, to purportedly preserve and protect customers' retirement funds.

1
2

**1.  Red Rock Acted in the State of California an Unregistered Investment Adviser**

3      183.   During the Relevant Period, Red Rock, directly or by and through its

4   sales representatives or other agents, including Kelly and Spencer, from California,

5   engaged in the business of providing investment advice to customers and prospective

6   customers nationwide for compensation from the liquidation of customers' Qualified

7   Retirement Savings, some of which held securities.  As part of the scheme to defraud,

8   Red Rock, directly or by and through its sales representatives or other agents, assisted

9   at least 592 customers in transferring Qualified Retirement Savings into SDIRAs.

10      184.   For example, directly or by and through its sales representatives or other

11   agents, Red Rock assisted customers with electronic SDIRA application and transfer

12   forms.  In some cases, Red Rock's representatives or other agents facilitated phone

13   calls between customers and the entity holding the customer's Qualified Retirement

14   Savings, which included securities, to arrange the liquidation of the customer's

15   Qualified Retirement Savings and the transfer of their Qualified Retirement Savings

16   into a SDIRA.

17      185.   Spencer and Red Rock, directly or by and through Red Rock's sales

18   representatives or other agents, steered customers to purchase the RTH coins through

19   their SDIRAs.  Kelly selected the mark-ups on the RTH coins sold to customers.

20      186.   During the Relevant Period, Red Rock, directly or by and through its

21   sales representatives or other agents, for compensation in the form of mark-ups on

22   precious metals sales, commissions, and distributions, engaged in the business of

23   providing investment advice directly and by or through publications, writings, or

24   sales calls including:

25         a.  Spencer and Red Rock, directly or by and through Red Rock's sales
26            representatives or other agents, held Red Rock out as an IA to customers.
            For example, on sales calls and in written correspondence, Spencer told
            prospective customers that Red Rock was not a retail shop, it was an
27            investment firm and the company's marketing guides state that it "has been
            in the investment and financial services industry since 2009";
28

b. With Kelly's approval, Red Rock paid third parties and Red Rock staff to prepare marketing materials.  These marketing materials compared the securities market to the precious metals market.  Kelly consented to the use of these materials and provided these materials to Red Rock's staff who provided these materials to prospective and existing customers;

c. Kelly, Spencer, and Red Rock, directly or by and through Red Rock's sales representatives and other agents, touted the advantages of investing in precious metals as an alternative to stocks, bonds, and the U.S. Dollar. For example, in the late summer or early fall of 2020, Kelly and Spencer told California Customer 1 that he needed gold and silver in his IRA to protect against market drops or inflation;

d. Red Rock, directly or by and through its marketing materials, sales representatives, or other agents, advised about market trends, specifically that the stock market would fall or lose value;

e. Red Rock, directly or by and through its sales representatives or other agents, sent emails highlighting articles that would induce fear in the customers about their preexisting Qualified Retirement Savings;

f. Red Rock posted charts on its website directly comparing the Dow Jones, S&P 500, and value of the U.S. dollar to the value of gold and silver.  Kelly advised sales staff to refer prospective clients to these charts;

g. Red Rock, directly or by and through its sales representatives or other agents, including Spencer, advised and directed customers to sell securities held in Qualified Retirement Savings and transfer the proceeds to SDIRAs in order to purchase RTH coins from Defendants;

h. Spencer advised prospective clients to "be careful what you wish for because, if you want to see gold go to the moon and silver go to the moon - - granted it's now part of your portfolio - - that means the rest of what you have [in the stock market] has to become worth nothing";

i. Red Rock, directly or by and through its sales representatives or other agents, provided asset allocation advice, recommending that clients transfer 10% to 30% of their retirement savings into precious metals to diversify; and

j. By way of example, Kelly, Spencer, and Red Rock, directly or by and through Red Rock's sales representatives or other agents, provided investment advice to the following customers and prospective customers:

(i) In the late summer and early fall of 2020, Red Rock provided retirement-aged California Customer 1 with a copy of its TSP Playbook.  Spencer told California Customer 1 that he had a Ph.D. in economics and encouraged California Customer 1 to liquidate as much as possible out of his TSP account to purchase precious metals. Spencer recommended the Canadian RTH coins.  When California Customer 1 inquired about purchasing non-Canadian coins, Spencer stated that he knew best and was adamant that the RTH coins would save California Customer 1 the most on taxes.  Kelly and Spencer further told California Customer 1 the importance of gold and silver in his IRA to protect against market drops or inflation.  California

1

Customer 1 liquidated $150,000 worth of securities from his TSP account to purchase RTH coins; and

2

(ii)   In August of 2021, a Red Rock sales representative informed prospective California Customer 2 that "silver has a better upside than gold which could be double the profit potential . . . .  If the stock market has a correction, and we are due for one, that could drive up the price of precious metals so that could drive up those expectations." The Red Rock sales representative recommended that prospective California Customer 2 transfer 10% to 30% of his retirement savings into precious metals to diversify.

3

4

5

6

7      187.   During the Relevant Period, Red Rock advertised in a widely circulated

8 newsletter for federal government employees.  These advertisements were aimed at

9 TSP participants.  A TSP is a retirement savings and investment plan for federal

10 government employees which offers participants the ability to invest in securities.

11      188.   The advertisement invited readers to claim a free copy of the *#1 TSP*

12 *Playbook* and noted that inside the document prospective customers would discover:

13

How precious metals can protect [their] retirement savings from inflation, economic uncertainty, stock market crashes and increasing foreign currency manipulation.  Why gold and silver are positioned for big gains in the next 2-4 years.

14

15

16      189.   The advertisement went on to discuss the "Advantages of Rolling Over

17 Your TSP to A Self Directed Gold IRA" including:

18

The current TSP structure could doom you to failure, locking you in to poor investments in your portfolio. If the market crashes, your retirement savings could be at risk for major losses.  In times of pandemic, tragedy and extreme market crashes, Gold has reached record highs.  It is truly the counterbalance investment when things go bad.

19

20

21

22      190.   Prospective customers were warned that they need to "Act quickly. For

23 those TSP holders that continue to follow the same path with their investment

24 strategy, things could get a lot worse: there is no stimulus for a loss of your

25 retirement savings.  Even losing 50% of your retirement could have implications on

26 you and your family for decades to come."

27

28

191.    During the Relevant Period, Red Rock, by and through its sales representatives and other agents, routinely provided prospective customers with a copy of the company's *#1 TSP Playbook* containing investment advice, including:

> *In the section titled Market Roller Coasters, Frank's Big Drop*: "Let's not fool ourselves, another market down turn is coming. It's inevitable, like the tide.  Markets run in waves, and all waves grow, break and crash, right?  So your TSPs total value is tied to whatever market you're in. . . .  As of July, 2019, we're back where we were a dozen years ago. . . .  That's why when the tide comes, if you've moved out of your TSP into a self-directed IRA, you cannot only avoid the pain of market crashes, you can profit by them.  Because there's another market we haven't talked about in this chapter yet…and that's precious metals.  Typically, when stocks, real estate, and other dollar-denominated assets are up, metals move in the opposite direction.  And the reverse is also true."

> *In the section titled Where to Go from Here*: "I've tried to explain both the reasons we believe that precious metal should be a part of your retirement.  I've illustrated how moving a percentage of your TSP into a self-directed individual retirement account can be a good move in helping to secure your future.  We've talked about market trends and how to read them in order to create, grow and preserve your wealth. . . .  The one thing that's absolutely certain, however, is that change is coming.  As I write this, we're in an unprecedented bull stock market. . . . it's destined to end up crashing on the shore."

192.    During the Relevant Period, Red Rock, by and through its sales representatives and other agents, routinely provided prospective customers with a copy of the company's *2020 A Case for Silver Investment Guide* containing investment advice, including "You Can Protect Your Retirement Savings from a Severe Market Correction."  After discussing the worst stock market crashes in U.S. history, the guide states: "Is there something you can do to protect yourself?  Yes.  You can invest your hard-earned money in gold and silver."

193.    During the Relevant Period, Red Rock, by and through its sales representatives and other agents, routinely provided prospective customers with a copy of the company's *Gold and Silver Guide* containing investment advice, including:

So how can you diversify into gold, silver, and other precious metals? You could use some of your savings to make a purchase right now.  But a better way [is] to use money already in a 401(k) or IRA account to purchase gold and silver. . . .

### 2.  Defendants Engaged in Investment Adviser and Commodities Fraud

194.   Kelly, Spencer, and Red Rock, directly or by and through Red Rock's sales representatives or other agents, engaged in a scheme to defraud and made material misrepresentations and material omissions in providing investment advice to customers to transfer their Qualified Retirement Savings, including selling their securities, to purchase commodities and commodity contracts in the form of RTH coins from Red Rock.

### a.  Defendants' Scheme to Defraud

195.   During the Relevant Period, Kelly, Spencer, and Red Rock, directly or by and through Red Rock's sales representatives or other agents, willfully engaged in a scheme to defraud by:

a.  Advising prospective customers that precious metals can protect retirement savings from stock market crashes and severe market corrections, and that customers can profit by purchasing precious metals including the RTH coin;

b.  Steering approximately 79% of all customers into the RTH coin, and counseling sales representatives that were not recommending the RTH coin which carried a high mark-up.  For example, Kelly and Spencer, on behalf of Red Rock, admonished senior sales representatives who sold bullion with low commissions to customers.  Between October 2019 through September 2020, Kelly and Spencer consistently admonished and counseled Senior Account Executive Z, claiming that the company would go out of business if he continued to recommend selling bullion with low commissions to customers.  Defendants Kelly and Spencer did not admonish or counsel Senior Account Executive Z when he recommended selling the RTH coins to customers; and

c.  Misrepresenting the mark-up on its premium coins in its Transaction Agreements, misleading customers about the mark-ups by routinely telling customers that Red Rock "charge[s] one to five percent above our costs on common bullion assets," despite knowing that the company steered consumers into "premium" coins including the RTH coin, with mark-ups above 1% to 5% and failing to disclose the actual mark-ups on the RTH coins.

### b. Defendants' Material Misrepresentations and Omissions

196.  Red Rock, directly or by and through its sales representatives or other agents, including Kelly and Spencer, made material misrepresentations and material omissions regarding Qualified Retirement Savings, including securities, as compared to precious metals which included, but were not limited to, misleading statements to instill fear in retirement-aged customers about their Qualified Retirement Savings to justify the advice to liquidate securities and transfer these funds to Defendants for the purchase of precious metals, while misrepresenting and failing to disclose the mark-ups charged on the RTH coins.

197.  Spencer and Red Rock, directly or by and through Red Rock's sales representatives or other agents, made material misrepresentations and material omissions regarding the company and its sales representatives or other agents' experience and expertise which included, but were not limited to, the following:

a. Misrepresented to prospective customers that Spencer had a Ph.D. in economics when he did not;

b. Misrepresented to prospective customers that Spencer had 25 years of experience in precious metals when he did not;

c. Misrepresented that Red Rock's leadership team, which included Kelly and Spencer, "have worked tirelessly" on the *#1 TSP Playbook* and that they have "spent nights countless [sic] hours pouring over pages of Thrift Savings Plan rules and regulations so as to make your options clear and easy to understand" when they did not.

d. Represented that Red Rock had 10 years in business, and failed to clarify that it began operating in the precious metals industry in 2016;

e. Misrepresented that Red Rock was an investment firm as opposed to a "retail company," when, in fact, it was a retail company; and

f. Misrepresented to customers and prospective customers that Red Rock had a "direct relationship" with "the mints" and an "exclusive relationship" with the RCM, and as such save their clients' money on mark-ups and lack of a middleman, when, in fact, no such relationships existed and Red Rock paid the "middleman"—Wholesaler 1—an additional markup.

198.   Red Rock, directly or by and through its sales representatives or other agents, made material misrepresentations and material omissions regarding their compensation structure which included, but were not limited to, the following:

    a.  Misrepresented how Red Rock's sales representatives or other agents were compensated; and

    b.  In light of the other statements made regarding transferring funds from Qualified Retirement Savings to purchase precious metals, failed to reveal conflicts of interest arising from Red Rock's sales representatives' profit share, commissions, and other compensation being tied to the amount of funds from customers' Qualified Retirement Savings invested in precious metals including the RTH coins.

199.   Kelly, Spencer, and Red Rock, directly or by and through Red Rock's sales representatives or other agents, made material misrepresentations regarding their mark-ups and fees, which included, but were not limited to, the following:

    a.  Spencer and other Red Rock staff misled customers about the mark-ups by routinely telling customers that Red Rock "charge[s] one to five percent above our costs on common bullion assets," despite knowing and failing to disclose that they were steering customers into "premium" products, specifically silver and gold RTH coins, which carried significantly higher mark-ups above 1% to 5%;

    b.  Misrepresented how the company makes its money or commissions.  For example, in August 2021, when prospective California Customer 2 asked how Red Rock makes its money or commission, a Red Rock sales representative told prospective California Customer 2 about the depository and administrative fees, but did not disclose the mark-up or commissions, even when this prospective customer asked the sales representative to confirm there wasn't a percentage the company makes on the transaction. The sales representative stated, "No, it's not like the financial institution that gets a percentage of your whole portfolio if it performs or not";

    c.  Misrepresented, in its Transaction Agreements until December of 2021, that the mark-up on Red Rock's premium coins typically ranges between 4% and 29% when in reality, the mark-up on the majority of the premium coins it sold, including the silver and gold RTH coins, carried mark-ups of approximately 100% to 130%. Kelly chose the mark-ups on the sale of the RTH coins and had the authority and responsibility for determining what Red Rock told its clients and prospective clients about the mark-ups and fees on the RTH coins;

    d.  Misrepresented in its December 2021 revised Transaction Agreement that the mark-up on premium coins can range from 5% to 120%, when in reality, the mark-ups on the silver RTH coins routinely exceeded 120%; and

    e.  Failed to disclose the mark-up on the gold and silver RTH coins to prospective customers during the Relevant Period.

1        200.   Spencer and Red Rock, directly or by and through Red Rock's sales

representatives or other agents, made material misrepresentations regarding the

precious metals it sold to customers, which included, but were not limited to, the

following:

      a.  Misrepresented that the value of the silver RTH coin was set by the RCM when it was not. For example, Spencer misrepresented to at least one customer that the value of the silver RTH coin was set by the RCM, and as such the re-salability and ROI were exceptionally, comparatively much stronger than the common one oz. assets, when it was not;

      b.  Misrepresented there was a limited mintage population of the silver RTH coins when there was not. Spencer under reported the mintage population of the silver RTH coin to at least one customer to make it appear as if the product justified a higher price;

      c.  Misrepresented to customers that the metals they bought from Red Rock were discounted when they were not; and

      d.  Misrepresented the retail value of customers' precious metals in its transaction agreements, on confirmation calls, and after the customer purchased the metals, lulling customers to keep their funds invested in the metals.  For example, Spencer claimed that the current retail value is based on the metals' spot price plus market demand, investor demand, and supply and demand when it is not.

        201.   Through this scheme to defraud and these material misrepresentations

and omissions, Defendants solicited customers to sell securities to ultimately gain

access to those funds through the sale of RTH coins. The profits obtained by Red

Rock and compensation paid to their sales representatives or other agents were

related to the amount of Qualified Retirement Savings, including securities, that

convinced customers to liquidate.

        202.   The practices discussed in this section resulted in almost immediate

substantial losses for customers due to Defendants' scheme to defraud and material

misrepresentations and omissions.

        203.   The foregoing conduct in relation to all of Red Rock's offers and sales

during the Relevant Period (both cash and SDIRA sales) also violates California state

law prohibiting schemes to defraud and material misrepresentations or omissions in connection with the offer, purchase, or sale of commodities.

## M.   Allegations Specific to Claims Brought by the State of Hawaii: Defendants Engaged in Fraud

204.   In February 2020, Hawaii Customer 1, age 72 at the time, was convinced by Red Rock's sales representatives or other agents to liquidate a portion of his TSP account that held securities in order to purchase precious metals from Red Rock.

205.   Red Rock's sales representatives or other agents assisted Hawaii Customer 1 with liquidating said securities and setting up a SDIRA with a third-party custodian.

206.   On March 24, 2020, Hawaii Customer 1 paid Red Rock $84,932.05 for 3,630 silver RTH coins.  Red Rock charged a mark-up of approximately 129% on the silver RTH coins Hawaii Customer 1 purchased.

207.   At no time prior to the sale did Red Rock disclose to Hawaii Customer 1 that Red Rock would charge an approximately 129% mark-up on the silver RTH coins he purchased.

208.   As a result of its undisclosed mark-up, Red Rock kept $47,833.45 of the $84,932.05 Hawaii Customer 1 paid, while paying Wholesaler 1 only $37,098.60 for the RTH coins sold to Hawaii Customer 1.

209.   Hawaii Customer 1 had no experience purchasing precious metals at the time he purchased silver RTH coins from Red Rock.

210.   In late 2019, Hawaii Customer 2, age 73 at the time, was convinced by Red Rock's sales representatives or other agents to liquidate a portion of her TSP account that held securities in order to purchase precious metals from Red Rock.

211.   Red Rock's sales representatives or other agents assisted Hawaii Customer 2 with filling out paperwork to liquidate said securities and setting up a SDIRA with a third-party custodian.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

212.   On December 17, 2019, Hawaii Customer 2 paid Red Rock $47,618.38 for 1,290 silver RTH coins and 40 gold RTH coins.  Red Rock charged mark-ups of approximately 120% on both the silver and gold RTH coins Hawaii Customer 2 purchased in December 2019.

213.   At no time prior to the sale did Red Rock disclose to Hawaii Customer 2 that Red Rock would charge an approximately 120% mark-up on both the silver and gold RTH coins she purchased in December 2019.

214.   As a result of its undisclosed mark-ups, Red Rock kept $26,015.98 of the $47,618.38 Hawaii Customer 2 paid, while paying Wholesaler 1 only $21,602.40 for the RTH coins sold to Hawaii Customer 2.

215.   Thereafter, on March 25, 2020, Hawaii Customer 2 paid Red Rock $22,010.69 for 225 silver RTH coins and 40 gold RTH coins.  Red Rock charged mark-ups of approximately 134% on the silver RTH coins and approximately 120% on the gold RTH coins Hawaii Customer 2 purchased in March 2020.

216.   At no time prior to the sale did Red Rock disclose to Hawaii Customer 2 that Red Rock would charge mark-ups of approximately 134% and approximately 120% on the silver and gold RTH coins she purchased in March 2020.

217.   As a result of its undisclosed mark-ups, Red Rock kept $12,147.84 of the $22,010.69 Hawaii Customer 2 paid, while paying Wholesaler 1 only $9,862.85 for the RTH coins sold to Hawaii Customer 2 in March 2020.

218.    Hawaii Customer 2 had no experience purchasing precious metals at the time she first purchased RTH coins from Red Rock in December 2019.

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

*(Brought by All Plaintiffs)*

### COUNT 1
### Fraud
### Violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022)

219.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

220.   7 U.S.C. § 9(1) provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the commission shall promulgate . . . .

221.   17 C.F.R § 180.1(a) provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1)  Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

222.   By reason of the conduct described above, Defendants, by and through Red Rock, its officers, employees, and agents, directly or indirectly, in connection with contracts of sale of commodities in interstate commerce, intentionally or recklessly violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

223. The acts, misrepresentations, omissions, and failures of Kelly, Spencer, and other officers, employees, and agents of Red Rock occurred within the scope of their employment, agency, or office with Red Rock. Therefore, Red Rock is liable for all of these acts and practices pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022).

224. During the Relevant Period, Kelly controlled Red Rock, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Red Rock's violations alleged in this count. Therefore, Kelly is liable for Red Rock's conduct described herein pursuant to 7 U.S.C. § 13c(b).

225. Each use or employment or attempted use or employment of any manipulative device, scheme, or artifice to defraud; untrue or misleading statement of fact, omission of material fact necessary to make statements not untrue or misleading; or act of engaging, or attempting to engage, in acts, practices or courses of business that operated or would have operated as a fraud or deceit on Red Rock's customers is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## VI.    VIOLATIONS OF THE CALIFORNIA CORPORATION CODE

*(Brought by Plaintiff California Department of Financial Protection & Innovation)*

### COUNT 2
**Commodities Fraud**
**Violations of Cal. Corp. Code § 29536**

226. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

227. California Corporations Code section 29536 provides:

> It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a

commodity, commodity contract, or commodity option to do any of the following:

(a) To willfully employ any device, scheme, or artifice to defraud.

(b) To willfully make any false report, enter any false record, make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(c) To willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons.

(d) To willfully misappropriate or convert the funds, security, or property of any other person.

228.   California Corporations Code section 29552 provides:
Any person who materially assists in any violation of this law, or any rule or order of the commissioner under this law, is jointly and severally liable with any other person liable under this law for the violation.

229.   Under California Commodity Law of 1990 (CCL) (Cal. Corp. Code, § 29500-29567) sections 29504 and 29515, precious metals including gold and silver coins are "commodities."

230.   Under CCL section 29505, a "commodity contract" means "any account, agreement, or contract for the purchase or sale, primarily for speculation or investment purposes and not for consumption by the offeree or purchaser . . . ."

231.   During the Relevant Period, Red Rock, by and through its sales representatives and other agents, including Kelly and Spencer, offered to sell and sold, and offered to purchase and purchased, commodities and entered into commodity contracts from its principal place of business in California.

232.   CCL section 29536 applies to the transactions, agreements, or contracts Defendants offered and sold.

233.   At all relevant times Defendants violated CCL section 29536 by the conduct described in this complaint including willfully employing a scheme to defraud customers out of their retirement savings by providing unlawful investment

advice to retirement aged customers stating that precious metals can protect retirement savings from stock market crashes and severe market corrections and customers can profit by transferring funds from their retirement accounts into SDIRAs to purchase precious metals.  Kelly, Spencer, and Red Rock, directly or by and through Red Rock's sales representatives and other agents, deceptively steered approximately 79% of all customers' purchases to RTH coins, with undisclosed mark-ups (and customer losses) between approximately 100% and 130% on each sale.  Defendants willfully misrepresented the mark-ups in the Transaction Agreements, on phone calls, and in emails, and failed to disclose the mark-ups. Alternatively:

  a. Red Rock violated CCL section 29536 and Kelly as Red Rock's CEO knowingly controlled and induced, or knowingly substantially assisted Red Rock's violations of 29536, by the conduct described in this complaint including: (1) hiring, training, and supervising sales representatives or other agents, (2) supervising the marketing department and approving Red Rock's marketing materials disseminated to the public, (3) overseeing the transaction agreements Red Rock offered prospective customers, (4) choosing the metals that Red Rock sold to the public and the mark-up on the precious metals, (5) admonishing and counseling sales representatives who did not recommend the RTH coins with high commissions and mark-ups to prospective customers, and (6) misrepresenting and failing to disclose Red Rock's approximately 100% to 130% mark-up on the RTH coins.

  b. Red Rock violated CCL section 29536 and Spencer as a Red Rock Senior Account Executive knowingly substantially assisted Red Rock's violations of 29536, by the conduct described in this complaint including: (1) training and assisting sales representatives or other agents, (2) advising prospective customers of the importance of gold and silver in their IRAs to protect against market drops or inflation, (3) steering clients into the RTH coins with undisclosed mark-ups ranging from approximately 100% to 130%; (4) misrepresenting that Red Rock had a direct relationship with the RCM when it did not; and (5) misleadingly informing customers that the markup on common bullion products was 1% to 5% when the markup on the coins Spencer recommended to these same clients were considered by Red Rock to be premium coins with marks-ups disclosed in the Transaction Agreement to be 5% to 120%, that in reality were approximately 100% to 130%.

1
2

**COUNT 3**
**Unlicensed Investment Advice**
**Violations of Cal. Corp. Code § 25230**

3       234.   The allegations in the preceding paragraphs are re-alleged and

4   incorporated herein by reference.

5       235.   An "investment adviser" is defined under the Corporate Securities Law

6   of 1968 (CSL) (Cal. Corp. Code, § 25000-25707) section 25009 in relevant part as

7   "any person who, for compensation, engages in the business of advising others . . . as

8   to the value of securities or as to the advisability of . . . selling securities . . . ."

9       236.   Corporations Code section 25230 provides, in relevant part:

10          (a) It is unlawful for any investment adviser to conduct business
11          as an investment adviser in this state unless the investment
            adviser has first applied for and secured from the commissioner
12          a certificate, then in effect, authorizing the investment adviser
            to do so or unless the investment adviser is exempted by the
            provisions of Chapter 1 (commencing with Section 25200) of
13          this part or unless the investment adviser is subject to Section
14          25230.1.

15      237.   California Corporations Code section 25403 provides:

16          (a) Every person who with knowledge directly or indirectly
            controls and induces any person to violate any provision of this
17          division or any rule or order thereunder shall be deemed to be in
            violation of that provision, rule, or order to the same extent as
18          the controlled and induced person.

19          (b) Any person that knowingly provides substantial assistance
            to another person in violation of any provision of this division
20          or any rule or order thereunder shall be deemed to be in
            violation of that provision, rule, or order to the same extent as
21          the person to whom the assistance was provided.

22          (c) It shall be unlawful for any person directly or indirectly to
            do any act or thing which would be unlawful for that person to
23          do under any provision of this division or any rule or order
            thereunder through or by any other person.
24
25          (d) Nothing in this section shall be construed to limit the power
            of the state to punish any person for any conduct which
26          constitutes a crime under any other statute.

27

28

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

238.   At all relevant times, Red Rock working from California conducted business as an investment adviser without a certificate from the Commissioner of the DFPI, or a valid exemption, in violation of CSL section 25230 by the conduct described in this complaint including comparing the stock market to the precious metals market, warning retirement-aged individuals that the stock market was volatile and due for a crash, and advising potential customers to purchase precious metals to preserve wealth and protect their investment because precious metals will profit. Defendants profited, and customers lost, when customers sold securities and purchased precious metals from Red Rock.  Additionally:

a.  Red Rock violated CSL section 25230 and Kelly as Red Rock's CEO knowingly controlled and induced, or knowingly substantially assisted, Red Rock's violations of 25230, by the conduct described in this complaint including: (1) hiring, training, and supervising sales representatives or other agents, (2) supervising the marketing department and approving Red Rock's marketing materials disseminated to the public, (3) overseeing the transaction agreements Red Rock offered to prospective customers, (4) advising potential clients of the importance of gold and silver in their IRAs to protect against market drops or inflation, (5) choosing the metals that Red Rock sold to the public and the mark-up on the precious metals, (6) admonishing and counseling sales representatives who did not recommend the RTH coins with high commissions and mark-ups to prospective customers, and (7) misrepresenting and failing to disclose Red Rock's approximately 100% to 130% mark-up on the RTH coins.

b.  Red Rock violated CSL section 25230 and Spencer as a Red Rock Senior Account Executive knowingly substantially assisted Red Rock's violations of 25230, by the conduct described in this complaint including: (1) training and assisting sales representatives or other agents, (2) providing Red Rock's marketing materials to prospective customers, (3) advising prospective customers of the importance of gold and silver in their IRAs to protect against market drops or inflation, (4) steering clients into the RTH coins with undisclosed mark-ups ranging from approximately 100% to 130%, (5) misrepresenting that Red Rock had a direct relationship with the RCM when it did not, and (6) misleadingly informing customers that the markup on common bullion products was 1% to 5% when the markup on the coins Spencer recommended to these same customers were considered by Red Rock to be premium coins with marks-ups disclosed in the Transaction Agreement to be 5% to 120%, that in reality carried mark-ups ranging from approximately 100% to 130%.

## COUNT 4
### Investment Adviser Fraud
### Violations of Cal. Corp. Code § 25235

239.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

240.    California Corporations Code section 25235 provides, in relevant part:

> It is unlawful for any investment adviser, directly or indirectly, in this state:
>
> (a) To employ any device, scheme, or artifice to defraud any client or prospective client.
>
> (b) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any client or prospective client.

241.    At all relevant times, Red Rock, directly or by and through its sales representatives, violated CSL section 25235 by the conduct described in this complaint including operating a scheme to defraud customers out of their retirement savings by comparing the stock market to the precious metals market, warning retirement aged individuals that the stock market was volatile and due for a crash, and advising potential customers to purchase precious metals to preserve wealth and protect their investment because precious metals will profit.  Red Rock, directly or by and through its sales representatives or other agents, deceptively steered approximately 79% of all customers' purchases to RTH coins, with undisclosed mark-ups (and customer losses) between approximately 100% to 130% on each sale. Red Rock, directly or by and through its sales representatives or other agents, willfully misrepresented the mark-ups in the Transaction Agreements, on phone calls, and in emails, and failed to disclose the mark-ups. Defendants profited, and customers lost, when customers sold securities and purchased precious metals from Red Rock.  Additionally:

   a. Red Rock violated CSL section 25235 and Kelly as Red Rock's CEO knowingly controlled and induced, or knowingly substantially assisted, Red Rock's violations of 29536, by the conduct described in this complaint including: (1) hiring, training, and supervising sales representatives or other

agents, (2) supervising the marketing department and approving Red Rock's marketing materials disseminated to the public, (3) overseeing the transaction agreements Red Rock offered to prospective customers, (4) advising prospective customers of the importance of gold and silver in their IRAs to protect against market drops or inflation, (5) choosing the metals that Red Rock sold to the public and the mark-up on the precious metals, (6) admonishing and counseling sales representatives who did not recommend the RTH coins with high commissions and mark-ups to prospective customers, and (7) misrepresenting and failing to disclose Red Rock's approximately 100% to 130% mark-up on the RTH coins.

b. Red Rock violated CSL section 25235 and Spencer as a Red Rock Senior Account Executive knowingly substantially assisted Red Rock's violations of 29535, by the conduct described in this complaint including: (1) training, and assisting sales representatives or other agents, (2) providing Red Rock's marketing materials to prospective customers, (3) advising  prospective customers of the importance of gold and silver in their IRAs to protect against market drops or inflation, (4) steering clients into the RTH coins with undisclosed mark-ups ranging from approximately 100% to 130%, (5) misrepresenting that Red Rock had a direct relationship with the RCM when it did not, and (6) misleadingly informing customers that the markup on common bullion products was 1% to 5% when the markup on the coins Spencer recommended to these same clients were considered by Red Rock to be premium coins with marks-ups disclosed in the Transaction Agreement to be 5% to 120%, that in reality carried mark-ups ranging from approximately 100% to 130%.

## VII.   VIOLATIONS OF THE HAWAII REVISED STATUTES

*(Brought by Plaintiff State of Hawaii, Department of Commerce and Consumer Affairs, Securities Enforcement Branch)*

### COUNT 5
**Material Misrepresentations & Omissions
in Connection with the Sale of a Security
Violations of Hawaii Revised Statutes § 485A-501(a)(2) (2022)**

242.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

243.   Hawaii Revised Statutes § 485A-501(a)(2) makes it unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly, to make an untrue statement of a material fact or to fail to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

244.   During the Relevant Period, Defendants, in connection with the sale of securities to Hawaii Customers 1 and 2, directly or indirectly, by and through their sales representatives or other agents, made untrue statements of material fact and failed to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as contained in the complaint.  As a result of the material misrepresentations and omissions by Defendants, Hawaii Customers 1 and 2 liquidated the securities held in their respective retirement accounts, and used those funds to purchase precious metals from Defendants.  The material misrepresentations and omissions resulted in Defendants converting a majority of the investment funds for their own benefit without the knowledge of Hawaii Customers 1 and 2.

245.   As a result of their conduct, Defendants violated Hawaii Revised Statutes § 485A-501(a)(2).

## COUNT 6
### Financial Exploitation of the Elderly
### Violations of Hawaii Revised Statutes § 485A-603.5 (2022)

246.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

247.   Pursuant to Hawaii Revised Statutes § 485A-603.5, if a person commits a violation under this chapter and the violation is directed toward, targets, or is committed against a person who at the time of the violation is sixty-two years of age or older, a court, in addition to any other civil penalty, may impose a civil penalty not to exceed $50,000.00 for each violation; provided that this section shall not apply to registered broker-dealers for violations of § 485A-412(d)(9).

248.   Hawaii Customers 1 and 2 were both 62 years of age or older at the time Defendants committed violations against them, as described in Section M and Count 5, above.

249.    As a result of Defendants' violations of Hawaii Revised Statutes § 485A-501(a)(2), Defendants may be assessed and held liable for any additional penalties imposed against them by this Court pursuant to, and in accordance with, Hawaii Revised Statutes § 485A-603.5.

## VIII.  RELIEF REQUESTED

The CFTC and the States respectfully request that this Court, as authorized by Sections 6c and 6d(1) of the CEA, 7 U.S.C. §§ 13a-1, 13a-2(1), and pursuant to its own equitable powers:

A.    Find that Defendants violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021);

B.    Find that Defendants violated the laws of the States as set forth above;

C.    Enter an order of permanent injunction enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) and the laws of the States;

D.    Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the CEA, 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in CFTC Regulation 1.3, 17 C.F.R. § 1.3 (2022)), or precious metals that are commodities, as that term is defined herein, for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3) Having any commodity interests or precious metals that are commodities, as that term is defined herein, traded on any Defendant's behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or precious metals that are commodities, as that term is defined herein;

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests or precious metals that are commodities, as that term is defined herein;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in CFTC Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

7) Acting as a principal (as that term is defined in CFTC Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9);

8) Acting or associating with an investment adviser or investment adviser representative or broker-dealer, in violation of the laws of California; and

9) In connection with offer, sale or purchase of any security, employing any device, scheme, or artifice to defraud another person, making any untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; or engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in violation of the laws of the States.

E.  Enter an order directing Defendants as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the CEA or CFTC Regulations or the laws of the States, as described herein, including pre-judgment and post-judgment interest;

F.  Enter an order requiring Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

G.  Enter an order directing Defendants to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any of the customers whose funds were received by Defendants as a result of Defendants' violations of the CEA or CFTC Regulations or the laws of the States as described herein;

H.  Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* CFTC Regulation 143.8, 17 C.F.R. § 143.8 (2022), for

each violation of the CEA or CFTC Regulations, and pay civil monetary penalties and/or damages pursuant to the laws of the States during the Relevant Period, described herein;

I.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) and the laws of the States; and

J.      Enter an order providing such other and further relief as the Court deems proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: May 15, 2023         Respectfully submitted,

                            COMMODITY FUTURES
                            TRADING COMMISSION

                            By: /s/ James Holl
                            JAMES HOLL
                            California Bar No. 177885
                            jholl@cftc.gov
                            (202) 418-5311

                            JAMES A. GARCIA, *pro hac vice pending*
                            (Attorney-In-Charge)
                            DC Bar No. 458085
                            jgarcia@cftc.gov
                            (202) 418-5362

                            DANIEL C. JORDAN, *pro hac vice pending*
                            VA Bar No. 36382
                            djordan@cftc.gov
                            (202) 418-5339

                            Attorneys for Plaintiff
                            COMMODITY FUTURES
                            TRADING COMMISSION

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1155 21st Street, N.W.
Washington, DC 20581

FOR THE STATE OF CALIFORNIA

By: /s/ Danielle Stoumbos

CLOTHILDE V. HEWLETT
Commissioner
MARY ANN SMITH
Deputy Commissioner
AMY J. WINN
Assistant Chief Counsel
DANIELLE A. STOUMBOS
California Bar No. 264784
Telephone: (213) 503-2046
Danielle.Stoumbos@dfpi.ca.gov
JARI BINDER
California Bar No. 333694
Telephone: (415) 471-0919
Jari.Binder@dfpi.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA
DEPARTMENT OF FINANCIAL
PROTECTION AND INNOVATION
320 West Fourth Street, Suite 750
Los Angeles, California 90013

FOR THE STATE OF HAWAII

By: /s/ Keola Fong

KEOLA FONG, *pro hac vice pending*
Hawaii Bar No. 9855
Telephone: (808) 586-2740
kfong@dcca.hawaii.gov

Attorney for Plaintiff
STATE OF HAWAII

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEPARTMENT OF COMMERCE AND
CONSUMER AFFAIRS
SECURITIES ENFORCEMENT BRANCH
335 Merchant Street, Room 205
Honolulu, Hawaii 96813

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF