1

2                                                              **JS6**

3                  **UNITED STATES DISTRICT COURT**

4                  **CENTRAL DISTRICT OF CALIFORNIA**

5

6    COMMODITY FUTURES TRADING              Case No. 2:23-cv-03680-RGK-PVC
     COMMISSION, et al.**,**
7                                           **CONSENT ORDER OF**
                                            **PERMANENT INJUNCTION,**
8              Plaintiffs,                  **CIVIL MONETARY PENALTY,**
                                            **AND OTHER STATUTORY AND**
9         vs.                               **EQUITABLE RELIEF AGAINST**
                                            **ALL DEFENDANTS**
10   RED ROCK SECURED, LLC, et al.,
                                            Trial Date: May 14, 2024
11             Defendants.

12

13                    **I.    INTRODUCTION**

14        Plaintiffs Commodity Futures Trading Commission ("CFTC"), California

15   Department of Financial Protection & Innovation ("DFPI"), and State of Hawaii,

16   Department of Commerce and Consumer Affairs, Securities Enforcement Branch

17   ("SEB") (DFPI and SEB collectively the "States" or the "State Plaintiffs") filed a

18   Complaint on May 15, 2023 [ECF No. 1] and an Amended Complaint on August 31,

19   2023 [ECF No. 45] (collectively, "Complaint") against Defendants Red Rock

20   Secured, LLC ("Red Rock"), Sean L. Kelly ("Kelly"), and Anthony Spencer

21   ("Spencer") seeking injunctive and other equitable relief, as well as the imposition of

22   civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§

23   1–26 and the CFTC's Regulations ("Regulations") promulgated thereunder, 17

24   C.F.R. pts. 1–190 (2023), as well as violations of state laws.

25   ///

26   ///

27   ///

28
                                    - 1 -

## II.    CONSENTS AND AGREEMENTS

To effect settlement of the matters alleged in the Complaint against Defendants without a trial on the merits or any further judicial proceedings, Defendants specifically acknowledge the following:

1.    Consent to the entry of this Consent Order of Permanent Injunction, Civil Monetary Penalty, and Other Statutory and Equitable Relief Against All Defendants ("Consent Order");

2.    Affirm that they have read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the CFTC, the States, or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3.    Acknowledge service of the Summons and Complaint;

4.    Admit to the jurisdiction of this Court over them and the subject matter of this action pursuant to Sections 6c and 6d of the Act, 7 U.S.C. §§ 13a-1, 13a-2;

5.    Admit to the jurisdiction of the CFTC and the States over the conduct and transactions at issue in this action pursuant to the Act and the state law violations alleged in the Complaint;

6.    Admit that venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e);

7.    Waive

    a)    Any and all claims that Defendants may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the CFTC in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2023), relating to, or arising from, this action;

    b)    Any and all claims that Defendants may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L.

///

c)   No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C and 15 U.S.C.), relating to, or arising from, this action;

d)   Any claim of double jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

e)   Any and all rights of appeal from this Consent Order;

8.   Agree that the CFTC is the prevailing party in this action for purposes of the waiver of any and all rights under the Equal Access to Justice Act specified in subpart (a) of paragraph 7;

9.   Consent to the continued jurisdiction of this Court over them for the purpose of implementing and carrying out the terms and conditions of this Consent Order, and for any other purpose relevant to this action, even if Defendants now or in the future reside outside the jurisdiction of this Court;

10.   Agree that they will not oppose enforcement of this Consent Order by alleging that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waive any objection based thereon;

11.   Agree that neither Defendants nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect Defendants' (a) testimonial obligations; or (b) right to take legal or factual positions in other proceedings to which the CFTC and the States are not a party.  Defendants shall comply with this agreement, and shall undertake all steps necessary to ensure that all

of their agents or employees under their authority or control understand and comply with this agreement;

12.     Consent to the entry of this Consent Order without admitting or denying the allegations of the Complaint or any findings or conclusions in this Consent Order, except as to jurisdiction and venue, which they admit;

13.     Consent to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the CFTC or to which the CFTC is a party or claimant, and agree that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

14.     Consent to the use of the findings and conclusions in this Consent Order in this proceeding and in any other civil or administrative proceeding brought by the States or to which the States are a party or claimant, and agree that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

15.     Do not consent, however, to the use of this Consent Order, or the findings and conclusions herein, as the sole basis for any other proceeding brought by the CFTC or the States or to which the CFTC or the States is a party, other than a: statutory disqualification proceeding; proceeding in bankruptcy, or receivership; or proceeding to enforce the terms of this Consent Order;

16.     Do not consent to the use of this Consent Order, or the Findings of Fact or Conclusions of Law herein, by any other party in any other proceeding; and

17.     Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendants in any other proceeding.

## III.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

18.     The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions

of Law, permanent injunction, and equitable relief pursuant to Sections 6c and 6d of the Act, 7 U.S.C. §§ 13a-1, 13a-2, as set forth herein.

**THE COURT HEREBY FINDS:**

    **A.   Findings of Fact**

        **1.   The Parties to this Consent Order**

      19.   Plaintiff CFTC is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

      20.   The State Plaintiffs are the state regulatory agencies charged with administering and enforcing the commodities and securities laws and regulations of their states.  The State Plaintiffs join the claims asserted by the CFTC and have asserted state-specific claims, within their jurisdiction.

      21.   Red Rock Secured, LLC is a Nevada limited liability company formed on January 12, 2010.  On November 4, 2016, Red Rock registered with the California Secretary of State as a foreign limited liability company, with its principal office located at 898 N. Pacific Coast Highway, Suite 440, El Segundo, California.

      22.   Defendant Sean L. Kelly f/k/a Shade L. Kelly-Johnson resides in the Los Angeles, California area, is Red Rock's President and CEO, and is a signatory on Red Rock's bank accounts.  Kelly held an 80% ownership share in Red Rock, oversaw day-to-day operations, supervised employees, and participated in hiring and firing decisions.

      23.   Defendant Anthony "Tony" Spencer resides in the Los Angeles, California area, and, at points in time while employed by Red Rock, held the titles of Senior Account Executive and Director of Account Services.

        **2.   Red Rock's Precious Metals Business**

      24.   Red Rock is a precious metals retailer, meaning it sells various types of precious metals products (e.g., bars, rounds, and coins) directly to members of the public.

25.     Typically, in the metal coins industry coins are produced by a mint which sells them to precious metals distributors.  The distributors, in turn, sell the coins to precious metals wholesalers.  The precious metals wholesalers then sell the coins to precious metals retailers, such as Red Rock.  Each of these transactions includes a mark-up charged by the seller.

26.     From at least November 2019 through at least June 2022 ("Relevant Period"), Red Rock purchased all of its precious metals products from a single wholesaler, Bayside Metal Exchange ("BME").  [Identified in the Complaint as "Wholesaler 1"]

27.     For customers using tax-deferred or other retirement funds to purchase precious metals, Red Rock followed a three-step process:  First, Red Rock representatives assisted their customers in establishing a self-directed investment retirement account ("SDIRA") and transferring existing retirement funds into the newly-established SDIRA.  Second, Red Rock purchased precious metals for its customers using those SDIRA funds.  Third, Red Rock facilitated the transfer of the newly-purchased metals to a depository or, in some cases, directly to the customer.

28.     Red Rock's website explained Red Rock's mission as follows:  "Most people are worried about losing money in their retirement accounts.  At Red Rock Secured we convert that money into physical gold & silver so they can enjoy a worry-free retirement."  Promotional materials Red Rock provided to prospective customers–often styled as "Guides" or "Playbooks"–touted precious metals IRAs as a means to "protect your retirement" or "preserve or potentially even grow your retirement wealth."

29.     Kelly directed Red Rock sales personnel to emphasize these points in speaking with customers:

    a)     "At Red Rock Secured we know you want to be worry free.  In order to do that, you need to protect your retirement savings.  The

1    problem is you can wake up and half your retirement could be gone

2    which makes you feel powerless."

3         b)    "We believe that you deserve to be confident that everything you

4               have worked for will still be there tomorrow.  We understand, in the

5               last recession we saw too many Americans lose too much which is

6               why we for over a decade have worked with our clients to protect

7               their retirement savings by investing in gold and silver."

8         30.   "Trust" was also a common theme that Defendants promoted on Red

9    Rock's website, in its promotional materials provided to prospective customers, and

10   in its training materials for sales staff.  Such statements included:

11        a)    "Red Rock is dedicated to protecting your retirement – a company

12              built on trust, expertise, and performance."

13        b)    "All our client relationships are built on trust - this is an integral

14              part of how we do business and informs all of our actions. We trust

15              one another as we build trust with our clients."

16        31.   As part of its sales pitch, Red Rock told prospective customers that

17   certain categories of precious metals products are on the "CUSIP list" (Committee on

18   Uniform Security Procedures) and thus are "trackable" by the government, while

19   other "non-CUSIP" products, including the Canadian Red-Tailed Hawk ("RTH")

20   coins, are "private and non-trackable."  Red Rock told prospective customers that the

21   CUSIP list allows "financial institutions and government entities to track and identify

22   financial products."

23        32.   Red Rock also told prospective customers that "[b]y tagging, tracking,

24   and identifying precious metals assets, CUSIP enables financial institutions and the

25   government to *monitor* precious metals holdings and, of course, the investors who

26   hold them" (emphasis in original).  As such, according to Red Rock, "CUSIP metals

27   are often referred to as 'public' gold or silver."

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

33.    Red Rock told prospective customers that "Non-CUSIP metals act in nearly the opposite fashion—providing the highest levels of security and authenticity while maintaining anonymity."  As such, "Non-CUSIP metals are often called 'private' and/or 'premium' metals."

### 3.  Red Rock's Products

34.    Red Rock generally categorized its precious metals products as either "common bullion" products or "premium" products.  The "common bullion" category included comparatively less-expensive, lower-commission products such as metal bars and rounds.  In contrast, the "premium" category included comparatively more-expensive, higher-commission products such as the RTH coins.

35.    Promotional material Red Rock provided to prospective customers further categorized its precious metal offerings or "assets"  as "common bullion," "monetized bullion," or "monetized bullion (limited quantity)" (collectively, "Precious Metals").

36.    Red Rock's promotional material provided to prospective customers, including documents entitled "Precious Metals Categories & Options" and "Red Rock Secured Product Selection – Protect Your Retirement" steered them toward its monetized bullion (limited quantity) products.

37.    Red Rock told prospective customers that "[b]ars and rounds are the most common form of bullion.  Common in that investors who are new to precious metals investing tend to gravitate to bars and rounds based on inexperience and lack of knowledge concerning other available options."

38.    Red Rock told prospective customers that bars and rounds offer "no monetary value other than the value of the metal based on weight."  According to Red Rock, "[t]his can affect the long-term profit and growth of the asset and its eventual resaleability since it does not provide the functionality of a currency piece as Monetized Bullion does."

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST ALL DEFENDANTS

39.     Red Rock told prospective customers that common bullion assets are on the CUSIP list and thus trackable by the government.

40.     Red Rock told prospective customers that "monetized bullion" refers to coins produced from gold, silver, or other precious metals "that have been or are used as a medium of exchange."

41.     Red Rock told prospective customers that monetized bullion provides monetary value beyond the weight of the metal itself:  "Because Monetized Bullion provides monetary value and functionality as a currency piece, whereas common bullion assets like bars and rounds do not, long-term growth and profitability can prove much greater as investors seek to acquire assets that enable them to cover all their bases—as an investment as well as a potential crisis instrument should they need to use their metal as an alternative to the dollar."

42.     Red Rock told prospective customers that monetized bullion assets, like common bullion assets, are on the CUSIP list and thus trackable by the government.

43.     Red Rock told prospective customers that "monetized bullion (limited quantity)" assets are similar to monetized bullion assets in that they are produced by government mints, they may be used as media of exchange, and they function "as an investment and a potential crisis instrument."

44.     Red Rock told prospective customers that "[w]hile there are many similarities between" standard monetized bullion and monetized bullion (limited quantity), a "key differentiator that contributes to how the assets appreciate in value in the long term is mintage population."  Standard monetized bullion assets "are produced in significantly higher quantities," as compared to monetized bullion (limited quantity) assets.

45.     Red Rock told prospective customers that "[w]hereas Standard Monetized Bullion can increase in price based on just two factors—intrinsic value and monetary value—the additional variable of limited supply size can cause

1   Monetized Bullion (Limited Quantity) to move in value faster."

2       46.    Red Rock told prospective customers that, in contrast to common bullion

3   and standard monetized bullion assets, monetized bullion (limited quantity) assets are

4   *not* on the CUSIP list and thus *not* trackable by the government.

5       47.    Red Rock told prospective customers that monetized bullion (limited

6   quantity) was preferable to common bullion and standard monetized bullion:  "More

7   often than not, Monetized Bullion (Limited Quantity) is the preferred option when

8   building a precious metals portfolio for long-term profit, growth, and security."  And,

9   "[t]hese assets are for savvy investors who want to protect their portfolios with

10  precious metals through maximizing the value of their investment."

11      48.    Red Rock classified and promoted the RTH coins as monetized bullion

12  (limited quantity).

13      49.    Spencer and other sales personnel of Red Rock provided Red Rock's

14  "Precious Metals Categories & Options" document to clients.

15      50.    Red Rock's "Precious Metals Categories & Options" document was

16  available on its website.

17              **4.    Red Rock's Pricing**

18      51.    In its Transaction Agreements with customers for the purchase and sale

19  of precious metals, Red Rock told customers that common bullion products "are

20  priced for the most part in accordance with the value of the precious metal they

21  contain."  In contrast, premium products, including the RTH coins, "are priced at a

22  premium above the value of the precious metals they contain."  And:  "This premium

23  is based on various factors, including, but not limited to, speculative interest,

24  collector and investor demand, available supply, industry promotions, perceived

25  value and economic conditions."

26      52.    In its promotional literature provided to prospective customers, Red

27  Rock further explained how its products were priced: "[A]ll orders are based off of

28

current market prices, also referred to as spot price.  Spot price is a common industry wide standard used to determine the value of one ounce of gold or silver.  Different assets have different premiums above spot price."

53.    In the precious metals industry, the "spot price" refers to the price per ounce of metal available for immediate delivery on any one of a number of exchanges around the world where precious metals, including silver and gold, are traded each day.

54.    "Melt value" (or "melt") refers to the price of a given quantity of metal based on the "spot" (or per ounce) price.  For example, if the spot price of silver is $16.00 per ounce, the melt value of a half-ounce silver coin would be $8.00.

55.    The prices Red Rock paid BME to acquire the RTH coins were directly tied to the spot prices of gold and silver.

56.    Internally, Red Rock referred to the prices it paid to BME as its "cost of goods sold."

57.    Red Rock based the prices it charged customers on Red Rock's "cost of goods sold."

58.    Red Rock's mark-up on metals sold to customers was the difference between "its cost of goods sold" and the price Red Rock charged its customers for those same metals.

59.    Kelly determined what mark-ups Red Rock charged for the assets it sold to customers.

60.    For "common bullion" products, Red Rock charged its customers mark-ups of between approximately 3% to 5% above its cost of goods sold.

61.    For "premium" products, including the RTH coins, Red Rock charged its customers mark-ups of up to approximately 130% above its cost of goods sold.

62.    Red Rock did not tell its customers about the actual mark-ups it charged.

### 5.   The Canadian Red-Tailed Hawk Coin

63.   In late 2019, BME agreed to sell two coins—the half-ounce silver RTH coin and the one-tenth ounce gold RTH coin—to Red Rock exclusively.

64.   Both the initial silver and gold RTH coins—and later a quarter-ounce gold RTH coin—were produced by the Royal Canadian Mint ("RCM").

65.   The RCM sold the RTH coins to one of its U.S. distributors, A-Mark Precious Metals, Inc., which, in turn, sold the RTH coins to BME exclusively.

66.   BME then then sold the RTH coins to Red Rock exclusively.

67.   BME advised Red Rock that there was no mintage limit on the RTH coins.

68.   BME advised Kelly that the RCM would produce as many RTH coins as Red Rock could sell.

69.   Despite the absence of a mintage limit, Red Rock classified and promoted the silver and gold RTH coins as "monetized bullion (limited quantity)."

70.   BME sold Red Rock half-ounce silver RTH coins for "$2.95/coin over melt."  As BME explained to Kelly: "If the silver spot [price] is $18.00/oz, your cost is $9.00 + $2.95 = $11.95" per coin.

71.   BME sold Red Rock one-tenth-ounce gold RTH coins for "15% over melt."  As BME explained to Kelly: "If the gold spot [price] is $1500/oz, your cost is $150.00 x 1.15 = $172.50 per coin."

72.   Red Rock's mark-up on the silver RTH coins purchased by customers averaged 129.97%.

73.   Red Rock's mark-up on the one-tenth and one-quarter ounce gold RTH coin averaged 111.32% and  91.89%, respectively.

74.   Defendants incentivized Red Rock sales staff to sell its "premium" products, particularly the RTH coins.  While sales of common bullion products typically entitled Red Rock's sales staff to a commission of 1% of the total purchase,

the RTH coin sales carried an 8% commission.

75.   Beginning in January 2020, Spencer, who was one of Red Rock's top salespersons, was offered up to 10% sales commissions on his sales of the RTH coins.

76.   The RTH coins were Red Rock's best-selling products.

77.   Between November 2019 and June 2022, the half-ounce silver RTH coin accounted for 84.2% of Red Rock's total sales.

78.   Between November 2019 and June 2022, the one-tenth ounce and one-quarter ounce gold RTH coins accounted for 7.76% of Red Rock's total sales.

79.   Between November 2019 and June 2022, the silver and gold RTH coins accounted for 91.96% of Red Rock's total sales.

80.   Between November 2019 and June 2022, Red Rock sold 1,925,062 million half-ounce silver RTH coins.

81.    Between November 2019 and June 2022, Red Rock sold 9,575 one-tenth ounce gold RTH coins and 1,774 one-quarter ounce gold RTH coins.

82.   Between November 2019 and June 2022, customers paid Red Rock $63,661,800.34 to purchase half-ounce silver RTH coins.

83.   Between November 2019 and June 2022, customers paid Red Rock $5,863,078.65 to purchase one-tenth and one-quarter ounce gold RTH coins.

84.   Between November 2019 and June 2022, Red Rock paid BME $27,682,391.56 to purchase half-ounce silver RTH coins.

85.   Between November 2019 and June 2022, Red Rock paid BME $2,858,173.53 to purchase one-tenth and one-quarter ounce gold RTH coins.

86.   Red Rock's total profit on sales of the half-ounce silver RTH coins was $35,979,408.78.

87.   Red Rock's total profit on sales of the one-tenth and one-quarter ounce gold RTH coins was $3,004,905.12.

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST ALL DEFENDANTS

88.     Between November 2019 and June 2022, customers paid Red Rock a total of $69,524,878.99 for RTH coins.

89.     Between November 2019 and June 2022, Red Rock paid BME a total of $30,540,565.09 for RTH coins.

90.     Between November 2019 and June 2022, Red Rock's total profit on sales of all RTH coins was $38,984,313.90.

**6.     Defendants Representations and Omissions About Red Rock's Mark-Ups**

**a.  Red Rock's Transaction Agreements**

91.     Red Rock required its customers to sign a Transaction Agreement in order to purchase precious metals from Red Rock.

92.     Consistent with a Red Rock sales confirmation script, Red Rock sales staff routinely told customers to refer to their Transaction Agreement to answer any questions the customers might have.

93.     During the Relevant Period, none of the Transaction Agreements signed by Red Rock's customers disclosed Red Rock's actual mark-ups on the products it sold.

94.     In fact, for almost the entire Relevant Period, the Transaction Agreements did not even include the term "mark-up."

95.     The following language appeared in the Red Rock Transaction Agreement, under the heading "Bid/Ask Spread":  "The difference between the Purchase Price Client pays for Products under a Purchase Order and the price that Red Rock actually pays for the Products purchased by Client under such Purchase Order is known as the "spread" and it is stated as a percentage of the Purchase Price paid by the Client."

96.     One version of this "Bid/Ask Spread" provision informed customers that the "spread" on Red Rock's "premium … coins typically ranges, between 4% and

1    29%."

2        97.    A second version of this "Bid/Ask Spread" provision noted a typical

3    range of "5% for CUSIP assets and 29% for Premium/non-CUSIP assets."

4        98.    Red Rock characterized the RTH coins as both "premium" and "non-

5    CUSIP."

6        99.    In December 2021, Red Rock revised its Transaction Agreement to

7    include an explicit reference to "mark-up."  The "Bid/Ask Spread and Mark-Up"

8    section in this revised Transaction Agreement included language similar to the

9    opening sentence of the "Bid/Ask Spread" language quoted in SUF No. 71 above:

10   "'Mark-up' is the difference between the Purchase Price Clients pay for Products and

11   the price that Red Rock pays for such Products.  The mark-up can range anywhere

12   from 5% to 120% depending on the type of coin and the fair market value at the

13   time."

14       100.   None of the Transaction Agreements in use during the Relevant Period

15   specified the actual mark-ups Red Rock charged on any particular product sold by

16   Red Rock, including the approximately 100% to 130% mark-ups on the RTH coins.

17                   **b.  Representations and Omissions by Red Rock Sales**

18                       **Staff**

19       101.   Red Rock sales staff told customers that Red Rock charged 1% to 5%

20   "above our costs" on "common bullion assets."

21       102.   Red Rock sales staff were instructed to reference the 1% to 5% mark-up

22   associated with Red Rock's common bullion products when customers or prospective

23   customers questioned Red Rock's charges or fees.

24       103.   Spencer also told at least one customer that:  "Red Rock charges 1-5%

25   above its cost from the mint."

26       104.   On 8/25/2020, Joseph Abrahamson, a resident of Florida, paid Red Rock

27   $149,705.00 for 3,245 half-ounce silver and 60 one-tenth ounce gold RTH coins.

28

105.   Red Rock paid BME $66,109.50 for the silver and gold RTH coins sold to Abrahamson.

106.   Red Rock's mark-ups on the RTH coins Abrahamson purchased were approximately 129% for the silver coins and approximately 115% for the gold coins.

107.   During an 8/25/2020 telephone call confirming Abrahamson's purchase, Spencer told Abrahamson: "We charge anywhere from 1 to 5 percent above our cost on common bullion assets."

108.   Abrahamson understood Spencer to mean that Red Rock would charge a fee of 1 to 5 percent above cost on Abrahamson's purchase of RTH coins.

109.   Paying a fee of one to five percent above cost on his purchase was important to Abrahamson.

110.   No one from Red Rock told Abrahamson that he, in fact, paid more than twice the cost of the RTH coins he purchased.

111.   If someone from Red Rock had told Abrahamson that he was, in fact, paying more than twice the cost of the RTH coins he purchased, Abrahamson would not have gone through with the purchase.

112.   On 5/25/2021, Francis Losecco, a resident of New York, paid Red Rock $199,680.00 for 5,045 half-ounce silver RTH coins.

113.   Red Rock paid BME $87,177.60 for the silver RTH coins sold to Losecco.

114.   Red Rock's mark-up on the silver RTH coins Losecco purchased was approximately 129%.

115.   During a 5/25/2021 telephone call confirming Losecco's purchase, Spencer told Losecco: "Because we charge anywhere from one to five percent above our cost, okay, on common bullion assets. Your fee, based on the amount that you moved, was 1.5 percent."

116.   Being charged a fee of 1.5 percent was significant to Losecco in his

1   decision to purchase RTH coins.

2        117.   On 11/15/2021, Lloyd Lawrence, resident of Texas, paid Red Rock

3   $499,690.00 for 13,755 half-ounce silver RTH coins.

4        118.   Red Rock paid BME $217,879.20 for the silver RTH coins sold to

5   Lawrence.

6        119.   Red Rock's mark-up on the silver RTH coins Lawrence purchased was

7   approximately 129%.

8        120.   During a 10/29/2021 telephone call with Lawrence, Spencer told

9   Lawrence:  "We charge anywhere from 1 to 5 percent above our cost on common

10  bullion assets, and that fee structure is adjusted accordingly, based on the investment

11  amount."

12       121.   During that same call, Spencer told Lawrence his fee to purchase the

13  RTH coins would be 1 percent.

14       122.   During a 11/15/2021 telephone call with Lawrence, Spencer confirmed

15  that Lawrence would pay a fee of 1 percent ($5,000).

16       123.   Paying a lower price was important to Lawrence in deciding to purchase

17  metal from Red Rock.

18       124.   On 7/7/2021, William Hoover, a resident of Georgia, paid Red Rock

19  $149,624.20 for 4,000 half-ounce silver RTH coins.

20       125.   Red Rock paid BME $65,400 for the silver RTH coins sold to Hoover.

21       126.   Red Rock's mark-up on the silver RTH coins Hoover purchased was

22  approximately 129%.

23       127.   On 5/4/2021, Spencer told Hoover:  "As I indicated yesterday, your fee,

24  which is a one time fee, is 1.83%. If you're moving 100k, for example, your fee is

25  1,830 dollars. Red Rock charges 1-5% above its cost from the mint. That range is

26  adjusted accordingly based on the investment amount."

27       128.   Spencer knew that Red Rock charged 29%, not 1-5%, on the front end of

28

transactions for "premium" products, including the RTH coins.

### 7. Defendants' Representations About Red Rock's Relationship with the Mints, the RCM's Role in Pricing the RTH Silver Coin, and "Limited Mintage" of the Silver RTH Coin

#### a. Representations About Red Rock's Relationship with the Mints

129.   On 7/16/2021 Spencer told customer Robert Bradley that:  "As we discussed previously, Red Rock Secured is not a retail company/coin shop. I would venture to guess that the other companies you've contacted fall more on the retail side of the spectrum. Retail companies do not have a direct relationship with the mints, the metal they provide to you must be secured through a metals distributor, and as a result you end up paying much higher premiums for the same metal you could acquire from Red Rock Secured for substantially less. The benefit to you in working with Red Rock is we are an investment firm, we have a direct relationship with the mints, and therefore we are able acquire the metal we provide to you at wholesale prices."

130.   During an 8/4/2020 telephone call with Abrahamson, Red Rock account executive Edward Coupland told Abrahamson:  "Because we're a Tier One company we do work with the mints directly, so we are able to [sic] wholesale prices and pass on the savings to you, which is why we can get you good pricing."

131.   During that same call, Spencer told Abrahamson:  "We have a direct relationship, as a result, with the mints.  So we buy our metal at wholesale, pass the savings on to you.  We don't go through anyone, in other words, to buy the metal, whereas retail shops typically through a middle guy.  So you're paying three, four, five times more than you should be at that point."

132.   During an 8/25/2020 telephone call confirming Abrahamson's purchase,

Spencer told Abrahamson: "So, we have a direct relationship with the mints. We buy our metal in volume and we buy our metal in wholesale and we pass the savings on to you. We charge anywhere from 1 to 5 percent above our cost on common bullion assets."

133.   During a 4/14/2021 telephone call, Spencer told Losecco: "We're not a retail shop in any way.  American Hartford Gold Group, Lear, Rosland, Advantage, Goldco, and the like, tend to fall on the retail side of the spectrum, which means that they have to go through a metals distributor to secure their metal.  So you, as an investor, as a consumer, you end up paying five to ten times more for the same metal that you could secure from us.  And the reason is that because we're an investment firm we have a direct relationship with the mints. We buy our metal at wholesale, pass the savings on to you."

134.   Spencer telling Losecco "because we're an investment firm, we have a direct relationship with the mints. We buy our metal at wholesale, pass the savings on to you" was important to Losecco in deciding to purchase metal from Red Rock.

135.   During his 10/29/2021 telephone call with Lawrence, Spencer stated: "So with us, however, there's no middleman.  We have a direct relationship with the mints, so we're not going through a metals distributor.  When you're going through a retail shop that works with a metals distributor you're paying the retail shop's markup, you're paying the metals distributor's markup, and you're paying the Mint's markup."

136.   On 11/27/2020, Timothy Rowe asked Spencer about the value of the half-ounce silver RTH coins:  "I am not understanding how 111 1/2 oz Canadian red tailed hawks are worth $4,000 dollars.  At about $27 an ounce that would come to 55.5 ounces x 27=$1498.5.  Can you explain?  Because I can buy the same thing from [a Red Rock competitor] for 26.7 and [sic] ounce.  Please let me know what happened here?"

137.   On 11/28/2020, Spencer responded to Rowe:  "As we discussed, your

assets are not on the CUSIP list and therefore are completely private with no tracking or serial number attached to them.  They are also monetized, which means you can use them as legal tender if necessary.  You can liquidate these assets privately, which is one of the main reason [sic] they are continuing to appreciate in value very quickly.  The version that [the Red Rock competitor] provides is a one ounce coin produced in 2015.  Anything 1 oz or larger is on the CUSIP list and is not a private asset.  [The Red Rock competitor] does not have access to the 1/2 oz Canadian Red Tailed Hawk, as they are a retail company, whereas Red Rock Secured has an exclusive relationship with the Royal Canadian Mint.  As a result, your assets are worth considerably more when you liquidate/sell them."

138.   In a 2/3/2021 telephone call with customer Stephanie Shein, Red Rock's Director of Sales, Bayani Ison stated:  "The way that we make money is that we have a markup on the coins, so we, essentially, just make money one time and one time only."

139.   In a 3/12/2021 telephone call with prospective customer Beverly Lantz, Ison stated:  "Well, right now, because of the higher demand, gold is really expensive on the premiums because we're -- you know, we see that -- this directly because we're a direct wholesaler to the U.S. Mint, the Canadian Mint, Perth and Swiss Mints."  Ison continued:  "And so what -- the way with that we save our clients money is that, you know, there's no middleman.  We buy directly from them and then pass the savings to you, so there's no additional markup, you know, like a -- for someone in between that we'd have to buy it from."

### b.  Representations About the RCM's Role in Pricing the Silver RTH Coin

140.   In a 10/28/2020 email message, a prospective customer, Tim McNeil, asked Spencer:  "So, are virtually all half-ounce Red Tailed Hawk coins currently owned by Red Rock or Red Rock clients?  If that is so, would not the price of that

1  coin above its bullion weight at any given time essentially be set by Red Rock?"

2  141.  Spencer responded to McNeil stating:  "The value is set by the mint,

3  which has listed the coin for 49.99 CAD per unit.  Therefore, re-saleability and ROI

4  are exceptionally, comparatively, much stronger than the common 1 oz. assets for the

5  reasons we've discussed."

6  142.  The RCM categorizes the RTH coins as "bullion" coins.

7  143.  The RCM does not list prices for its "bullion coins" because the RCM

8  does not sell them directly to the public.

9  144.  Kelly set the value (i.e., the price) of the RTH coins.

10                **c.  Representations about Limited Mintage of the Silver**

11                   **RTH Coin**

12  145.  Bullion coins, including the RTH coins, were not limited mintage coins.

13  146.  Red Rock was aware that the RTH coins were not limited mintage coins.

14  147.  On 6/25/2020, customer Lynn Vanasse wrote to Spencer:  "I am alarmed

15  at the cost of the coins you suggested for my purchase. I have tried to find this exact

16  coin and cannot find it for purchase elsewhere.  It is my understanding that it is not a

17  low mintage/scarce coin like some of the other l/2oz coins I  have looked at.  Please

18  don't take my sense of alarm personally - the bottom line is that I need some

19  assurance - pricing confirmation that the price you are asking me to pay for these

20  coins is a fair market value."

21  148.  On 6/26/2020, Spencer responded to Vanasse:  "You [sic] coins were

22  $27.09 when you bought them. They are now trading at $27.35 per coin. In addition

23  to not being on the CUSIP list, the other main reason these coins are priced the way

24  they are is they are part of a limited mintage population - 30k coins will be produced

25  for 2020."

26  149.  Just two weeks earlier, on 6/9/2020, Spencer confirmed purchases of

27  32,705 silver RTH coins by customers James and Dolores Kolody, residents of

28

1  Pennsylvania, for a total price of $885,414.60.

2  150.   On the same day Spencer told Vanasse that only 30,000 silver RTH

3  coins would be produced for 2020, BME advised Red Rock that:  (i) there was no

4  mintage limit on the RTH coins; and (ii) 446,360 silver RTH coins had been minted

5  between November 2019 and June 26, 2020.

6  151.   In September 2021, Kelly asked Fogel to ask the RCM to change the

7  mintage description for the RTH coins on the RCM's website.

8  152.   Referring Fogel to links for the RTH coins on the RCM website, Kelly

9  stated:  "They all say -Production Limit: NONE or worse Bullion would indicate they

10  are not limited mintage!"  Kelly continued:  "If we could have them update the pages

11  with the truth that would be optimal!"

12  153.   Following up on that message, Kelly told Fogel:  "It's really important to

13  us for several reasons."  Kelly continued:  "Primarily it is misrepresenting that these

14  coins are not limited mintage and even more still could be minted."

15                    **8.     Representations About Red Rock's Discounts and**

16                            **Bonuses Offered to Customers**

17  154.   Typically, Red Rock charged customers full price for assets the

18  customers purchased and did not provide discounts.

19  155.   This price was known internally at Red Rock as the "retail ask" price.

20  156.   Red Rock account executives, including Spencer, had continuous, real-

21  time access at their desks to Red Rock's retail ask prices, as well as the spot prices of

22  silver and gold.

23  157.   Trade tickets prepared by Red Rock account executives for each sale

24  showed the spot price(s) of metal at the time of purchase (in the upper-right corner)

25  as well as the price(s) Red Rock charged the customer.

26  158.   Some of the trade tickets also showed the "melt value" of the products

27  purchased by the customer.

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

159.   For example, a 12/23/2020 trade ticket showed the spot ask price of silver as $25.68 per ounce and Red Rock's retail ask price for a half-ounce silver RTH coins as $36.31 (or $72.62 per ounce).

160.   Red Rock offered a limited number of discounts or bonuses when customer purchases reached certain thresholds.

161.   On 5/4/2021, Spencer told Hoover:  "As I indicated yesterday, your fee, which is a one time fee, is 1.83%.  If you're moving 100k, for example, your fee is 1,830 dollars. Red Rock charges 1-5% above its cost from the mint.  That range is adjusted accordingly based on the investment amount.  There are no fees when you sell the metal back to Red Rock.  You also receive the 15% bonus at 125k, 12-month Price Protection Plan, and No Fees for Life on the account with Strata."

162.   Red Rock did not offer a 15% discount or bonus on precious metals purchased by customers.

163.   Spencer promised Abrahamson "a 10 percent metals promotion, which would have been 10 percent of the [$]150[,000], so an additional [$]15,000 in metals."

164.   Receiving 10 percent in additional metals was significant to Abrahamson in deciding to purchase metal from Red Rock.

165.   When confirming Abrahamson's purchase, Spencer told Abrahamson: "So, in addition to the 12-month price protection plan and the 10 percent in additional metal, you also have no fees for life on the account."  Spencer continued:  "Your subtotal -- as I mentioned, they took the $295 out, is $149,705.  However, what you're controlling in metal value is $165[,000], okay?"

166.   The invoice Red Rock sent to Abrahamson does not reference any discount, bonus or additional metal.

167.   Prior to Losecco's purchase, Spencer told him:  "So whatever the amount is you're moving, you get up to 10 percent in more metal that we place in the

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

1   account for you.  Okay?"  Losecco responded:  "Yeah, that sounds good."

2       168.   Receiving up to 10 percent in additional metal was important to Losecco

3   in deciding to purchase metal from Red Rock.

4       169.   The invoice Red Rock sent to Losecco does not reference any discount,

5   bonus or additional metal.

6       170.   On 6/24/2020, Vanasse, a resident of Minnesota, paid Red Rock

7   $20,122.69 for 745 half-ounce silver RTH coins.

8       171.   Red Rock paid BME $8,776.10 for the silver and gold RTH coins sold to

9   Vanasse.

10      172.   Confirming Vanasse's purchase, Spencer told Vanasse that all of the

11  silver RTH coins she bought were "provided at a discounted price."

12      173.   Red Rock's mark-up on the silver RTH coins Vanasse purchased was

13  approximately 129%.

14      174.   The coins Red Rock sold to Vanasse were not provided at a discounted

15  price.  Vanasse paid the full retail ask price:  Red Rock's cost of goods sold

16  ($8,776.10) + Red Rock's mark-up (129.2897%) = $20,122.69.

17      175.   The invoice Red Rock sent to Vanasse did not reference any discount,

18  bonus or additional metal.

19          **9.    Other Representations by Spencer**

20      176.   Spencer told customers he had a PhD in Economics.  For example,

21  Spencer told one customer he had a "PhD in Economics International Markets."

22  Spencer admitted this statement was inaccurate.  Spencer testified that he holds a

23  PhD in sociology with an emphasis in economics.

24      177.   Spencer's purported PhD in Economics was significant to customer

25  Losecco in deciding whether to purchase metal or coins from Red Rock.

26      178.   Spencer's purported PhD in Economics was significant to customer

27  Lawrence in deciding whether to purchase metal or coins from Red Rock.

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

1    179.   Spencer holds a PhD in sociology, not economics.

2    180.   Spencer told customers he had been helping customers with "building"

3   and "managing" their metals portfolios for over 20 years.

4    181.   Spencer's purported "over 25 years" of experience in the metals industry

5   was important to Losecco in deciding to purchase metal from Red Rock.

6    182.   Spencer's purported "over 20 years" of experience in the metals industry

7   was important to Lawrence in deciding to purchase metal from Red Rock.

8    183.   In fact, Spencer had 11 years of experience working in the metals

9   industry.

10    184.   Spencer told customers Red Rock was an "investment firm," not a "retail

11   shop."

12    185.   Red Rock is, in fact, a precious metals "retail shop."

13          **10.   Defendants' Representations About the "Retail/Market**

14                **Value" of Customers' RTH Coins**

15    186.   Account statements provided to customers from their SDIRA custodians

16   showed account values below the prices customers originally paid to Red Rock.

17    187.   Beginning in at least February 2021, Red Rock's Transaction Agreement

18   advised customers that:  "The 'melt value,' which represents the value of metal in its

19   raw and unrefined state prior to it being converted into a finished tangible asset, is not

20   indicative of your asset's true retail/market value.  For example, 'melt value' usually

21   represents approximately ½ of your purchase value on Non-CUSIP assets.

22   Conversely, the retail/market value of your assets is typically twice the melt value of

23   Non-CUSIP assets due to the following factors that add additional value to your

24   metals:  market demand, investor demand, and supply and demand."

25    188.   When confirming customer purchases over the phone, Red Rock

26   representatives read from a script reiterating to customers that the "melt value" of the

27   RTH coins represented only half of the RTH coins' "true retail/market" value:

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

"Please note the retail value of your product is different than its melt value. For example, the 'melt value' represents the value of metal in its raw and unrefined state prior to it being converted into a finished tangible asset.  Therefore, the melt value is approximately one half of your purchase value on Non-CUSIP assets.  The other half is based upon Non-CUSIP investment values such as the value of comparable assets found through the applicable mint: market demand, investor demand, and supply and demand.  As such, the 'melt value' is not indicative of your asset's true retail/market value."

189.   Spencer sent customers updates about the purported "current retail value" of their metals.

190.   On 8/20/2021, Spencer sent customer Robert Boudreau a "data overview" purporting to show the "current retail value" of his silver RTH coins.

191.   Spencer told Boudreau:  "As discussed, the following is your overview, including all four factors provided by the Royal Canadian Mint by percentage and corresponding dollar amount."  Spencer continued:  "[T]his is baseline data provided by the Royal Canadian Mint, not including the additional bonus metal you received."

192.   According to Spencer, the $100,014.58 "current retail value" of Boudreau's silver RTH coins broke down as follows:

"INVESTOR DEMAND = 28% (28,004.08)

SUPPLY AND DEMAND = 26% (26,003.79)

MARKET DEMAND = 26% (26,003.79)

SPOT = 20% (20,002.92)"

193.   Contrary to the representations in Red Rock's Transaction Agreement and confirmation script that melt value accounted for approximately one half of purchase value, Spencer told Boudreau that the spot or melt value accounted for less than one quarter of the "current retail value" of Boudreau's RTH coins.

194.   On 9/23/2021, Boudreau, a resident of Rhode Island, asked Spencer

about the disparity between the value of his RTH coins as reported by his SDIRA custodian ($32,000) and the amount of money he paid to Red Rock ($100,000):

a) Boudreau:  "Mornin, looking at equity, the balance is only showing 32 k As a balance with 0 pending. Looking to see where the rest is?"

b) Spencer:  "Bob, as we've discussed, that is the assessed value, not the retail value. Equity and all other custodians can only report the assessed value because they do not buy or sell metal. What I have been sending you weekly is the retail value."

c) Boudreau:  "I did not buy 32 k assets worth of silver I purchased 100 k, worth of silver and feel very cheated at this point in time! Make it right!"

d) Spencer:  "Bob, what you're seeing is the melt value, what the metal is before it's been taken out of the ground. Equity and all custodians, under the 1997 Tax Payers Relief Act, can only report melt because custodians do not buy or sell metal. We've covered this several times before, which is why I have been sending you the weekly review so you have an accurate accounting of the value of the account."

195.   In a 12/18/2020 "current retail value" update for customer Edward Lobo, a resident of Massachusetts, who purchased RTH coins, Spencer stated:  "The current retail value is 27,214.29.  The data that helps to inform the value of the investment – 75% of which -- is provided by the mint."

196.   The RCM does not provide information concerning the retail value of the bullion coins it produces to any entities and never provided such information to Red Rock.

197.   "Melt value" or "Intrinsic value" refers to the market value of a precious

metal coin or bar calculated by multiplying the particular coin's or bar's pure precious metal weight by the market value of its precious metal content.

198.   "Bullion" refers to precious metal coins or bars consisting primarily of gold, silver, platinum, or palladium that are commonly found in the precious metals marketplace, typically have no material market value above their melt value, and typically are of an unlimited or unfixed mintage.

199.   The coins Red Rock sold to its customers as "premium," including the RTH coins, were all bullion coins with unlimited or near unlimited mintages and availability, the values of which were determined almost exclusively by their melt value.  These coins have no material value above that melt value in the precious metals marketplace.

200.   The prices that Red Rock charged its customers for "premium" coins, including the RTH coins, significantly exceeded Red Rock's cost to purchase them and vastly exceeded competitive industry pricing.

201.   Because Red Rock charged inordinately high prices over their cost of purchasing the "premium" coins (including the RTH coins), and above the coins' melt value, the market resale value of its customers' coins immediately after purchase was far below the prices customers paid for them.

202.   Kelly and Spencer were made aware of silver RTH coins being resold at prices substantially below the prices charged by Red Rock.

203.   In September 2020, Kelly and Spencer heard that some silver RTH coins were offered for sale by a Canadian website unconnected to Red Rock.

204.   In response, Kelly wrote to Red Rock's wholesaler:  "Eugene, this is freaking me out.  What is this?"

205.   In October 2020, a prospective customer alerted Spencer that Red Rock was charging "more than double what they are selling for in Canada."

206.   In response, Kelly forwarded the email to Red Rock's controller and the

1  wholesaler stating: "Guys, this is KILLING our deals.  See below….. complete

2  bulshit [sic].  Is there a way we can have the candian [sic] mint reach out to them and

3  tell them they are selling OUR exclusive coin."

4  **11.  Kelly Acted as a Controlling Person of Red Rock**

5  207.  During the Relevant Period, Kelly owned an 80% share of Red Rock and

6  served as Red Rock's CEO.  The other two owners only provided capital to Red

7  Rock.  Neither of them worked for Red Rock or played any role in Red Rock's day-

8  to-day operations.

9  208.  Kelly was one of two signatories on Red Rock's bank accounts.  The

10  other signatory was Red Rock's Vice President of Finance who was hired by and

11  reports to Kelly.

12  209.  Kelly had discretion to take distributions from Red Rock and Red Rock

13  paid some of his personal expenses directly.

14  210.  Kelly was involved in hiring Red Rock staff.

15  211.  Kelly hired Spencer at Red Rock.

16  212.  Kelly recruited Bayani Ison to join Red Rock as a senior account

17  executive who later served as Red Rock's sales manager then director of sales.

18  213.  In most cases, Kelly led weekly Monday sales meetings with Red

19  Rock's sales staff; if he was unavailable, Ison or Red Rock's president, Dave Clemen,

20  would step in for Kelly.

21  214.  Kelly determined the mark-ups Red Rock charged for its "premium"

22  coins, including the RTH coins, as well as the commissions Red Rock paid its sales

23  staff.

24  215.  On at least some occasions, Kelly reviewed the recorded calls between

25  Red Rock sales staff and customers and provided written guidance about what sales

26  staff could or should tell prospective customers.

27  216.  Kelly testified that, "at the end of the day," he was "responsible for

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

1  everything" at Red Rock.

2        **12. Kelly's and Spencer's Compensation from Red Rock**

3        217.   Kelly's compensation from Red Rock was approximately $2.85 million.

4        218.   Spencer's compensation from Red Rock was approximately $2.25

5  million.

6        **13. Facts Relating to Claims Brought by the State of**

7             **California**

8        219.   The laws of the state of California govern the registration of Investment

9  Advisers ("IAs"), Cal. Corp. Code § 25230.

10       220.   The laws of the State of California also prohibit:  (1) fraud in connection

11  with investment advisory services, Cal. Corp. Code § 25235; and (2) fraud in

12  connection with the offer, purchase, or sale of commodities and commodity contracts,

13  Cal. Corp. Code § 29536.

14       221.   During the Relevant Period, Defendants engaged in an aggressive

15  advertising campaign over various channels including phone solicitations, Red

16  Rock's website, direct marketing emails, and advertisements in third party emails and

17  newsletters.  Defendants used scare tactics to convince prospective customers to

18  transfer funds, including funds from liquidating securities, in their tax-deferred

19  retirement accounts, including IRAs, 401(k) plans, and the U.S. Government Thrift

20  Savings Plans ("TSP") (collectively, "Qualified Retirement Savings") to purchase

21  precious metals, including the RTH coins, to purportedly preserve and protect

22  customers' retirement funds.

23        **a. Investment Advice**

24       222.   During the Relevant Period, Red Rock, directly or by and through its

25  sales representatives or other agents, including Kelly and Spencer, from California,

26  engaged in the business of providing investment advice to customers and prospective

27  customers nationwide for compensation from the liquidation of customers' Qualified

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

Retirement Savings, some of which held securities.  As part of the scheme to defraud, Red Rock, directly or by and through its sales representatives or other agents, assisted at least 592 customers in transferring Qualified Retirement Savings into SDIRAs.

223.   For example, directly or by and through its sales representatives or other agents, Red Rock assisted customers with electronic SDIRA application and transfer forms.  In some cases, Red Rock's representatives or other agents facilitated phone calls between customers and the entity holding the customer's Qualified Retirement Savings, which included securities, to arrange the liquidation of the customer's Qualified Retirement Savings and the transfer of their Qualified Retirement Savings into a SDIRA.

224.   Red Rock, directly or by and through Red Rock's sales representatives or other agents, steered customers to purchase the RTH coins through their SDIRAs. Kelly selected the mark-ups on the RTH coins sold to customers.

225.   During the Relevant Period, Red Rock, directly or by and through its sales representatives or other agents, for compensation in the form of mark-ups on precious metals sales, commissions, and distributions, engaged in the business of providing investment advice directly and by or through publications, writings, or sales calls including:

    a) Red Rock, directly or by and through Red Rock's sales representatives or other agents, held Red Rock out as an investment adviser.  For example, on sales calls and in written correspondence, Spencer told prospective customers that Red Rock was not a retail shop, it was an investment firm and the company's marketing guides state that it "has been in the investment and financial services industry since 2009";

    b) With Kelly's approval, Red Rock paid third parties and Red Rock staff to prepare marketing materials.  These marketing

materials compared the securities market to the precious metals
market.  Kelly consented to the use of these materials and
provided these materials to Red Rock's staff who provided
these materials to prospective and existing customers;

c) Spencer and Red Rock, directly or by and through Red Rock's
sales representatives and other agents, touted the advantages of
investing in precious metals as an alternative to stocks, bonds,
and the U.S. Dollar. For example, in the late summer or early
fall of 2020, Spencer told California Customer 1 that he needed
gold and silver in his IRA to protect against market drops or
inflation;

d) Red Rock, directly or by and through its marketing materials,
sales representatives, or other agents, advised about market
trends, specifically that the stock market would fall or lose
value;

e) Red Rock, directly or by and through its sales representatives or
other agents, sent emails highlighting articles that would induce
fear in the customers about their preexisting Qualified
Retirement Savings;

f) Red Rock posted charts on its website directly comparing the
growth rate of the Dow Jones, S&P 500, and the U.S. dollar to
the growth rate of gold and silver.  Kelly advised sales staff to
refer prospective clients to these charts;

g) Red Rock, directly or by and through its sales representatives or
other agents, including Spencer, advised and directed customers
to sell securities held in Qualified Retirement Savings and

transfer the proceeds to SDIRAs in order to purchase RTH coins from Defendants;

h) Spencer advised prospective clients to "be careful what you wish for because, if you want to see gold go to the moon and silver go to the moon -- granted it's now part of your portfolio -- that means the rest of what you have [in the stock market] has to become worth nothing";

i) Red Rock, directly or by and through its sales representatives or other agents, including Spencer, provided asset allocation advice, recommending that clients have 10% to 30% of their retirement savings in precious metals to diversify; and

j) By way of example, Defendants, directly or by and through Red Rock's sales representatives or other agents, provided investment advice to the following customers and prospective customers:

(i) In the late summer and early fall of 2020, Red Rock provided retirement-aged California Customer 1 with a copy of its TSP Playbook. Spencer told California Customer 1 that he had a Ph.D. in economics and encouraged California Customer 1 to liquidate 20-30% out of his TSP account to purchase precious metals. Spencer recommended the Canadian RTH coins. When California Customer 1 inquired about purchasing non-Canadian coins, Spencer was adamant that the RTH coins would save California Customer 1 the most on taxes. Spencer further told California Customer 1 the importance of gold and silver in his IRA to protect

1    against market drops and inflation.  California
2    Customer 1 liquidated $150,000 worth of securities
3    from his TSP account to purchase RTH coins; and

4    (ii)   In August of 2021, a Red Rock sales representative
5    informed prospective California Customer 2 that "silver
6    has a better upside than gold which could be double the
7    profit potential . . . .  If the stock market has a
8    correction, and we are due for one, that could drive up
9    the price of precious metals so that could drive up those
10   expectations."  The Red Rock sales representative
11   recommended that prospective California Customer 2
12   transfer 10% to 30% of his retirement savings into
13   precious metals to diversify.

14   226.   During the Relevant Period, Red Rock advertised in a widely circulated

15   newsletter for federal government employees.  These advertisements were aimed at

16   TSP participants.  A TSP is a retirement savings and investment plan for federal

17   government employees which offers participants the ability to invest in securities.

18   227.   The advertisement invited readers to claim a free copy of the #1 TSP

19   Playbook and noted that inside the document prospective customers would discover:

20   How precious metals can protect [their] retirement savings from

21   inflation, economic uncertainty, stock market crashes and increasing

22   foreign currency manipulation.  Why gold and silver are positioned

23   for big gains in the next 2-4 years.

24   228.   The advertisement went on to discuss the "Advantages of Rolling Over

25   Your TSP to A Self Directed Gold IRA" including:

26   The current TSP structure could doom you to failure, locking you in

27   to poor investments in your portfolio. If the market crashes, your

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

retirement savings could be at risk for major losses.  In times of

pandemic, tragedy and extreme market crashes, Gold has reached

record highs.  It is truly the counterbalance investment when things go

bad.

229.   Prospective customers were warned that they need to "Act quickly.  For those TSP holders that continue to follow the same path with their investment strategy, things could get a lot worse: there is no stimulus for a loss of your retirement savings.  Even losing 50% of your retirement could have implications on you and your family for decades to come."

230.   During the Relevant Period, Red Rock, by and through its sales representatives and other agents, routinely provided prospective customers with a copy of the company's #1 TSP Playbook containing investment advice, including:

*In the section titled Market Roller Coasters, Frank's Big Drop*:

"Let's not fool ourselves, another market down turn is coming.  It's

inevitable, like the tide.  Markets run in waves, and all waves grow,

break and crash, right?  So your TSPs total value is tied to whatever

market you're in. . . .  As of July, 2019, we're back where we were a

dozen years ago. . . .  That's why when the tide comes, if you've

moved out of your TSP into a self-directed IRA, you cannot only

avoid the pain of market crashes, you can profit by them.  Because

there's another market we haven't talked about in this chapter

yet…and that's precious metals.  Typically, when stocks, real estate,

and other dollar-denominated assets are up, metals move in the

opposite direction.  And the reverse is also true."

*In the section titled Where to Go from Here*: "I've tried to explain

both the reasons we believe that precious metal should be a part of

your retirement.  I've illustrated how moving a percentage of your

1    TSP into a self-directed individual retirement account can be a good

2    move in helping to secure your future.  We've talked about market

3    trends and how to read them in order to create, grow and preserve

4    your wealth. . . .  The one thing that's absolutely certain, however, is

5    that change is coming.  As I write this, we're in an unprecedented bull

6    stock market. . . . it's destined to end up crashing on the shore."

7    231.   During the Relevant Period, Red Rock, by and through its sales

8    representatives and other agents, routinely provided prospective customers with a

9    copy of the company's 2020 A Case for Silver Investment Guide containing

10   investment advice, including "You Can Protect Your Retirement Savings from a

11   Severe Market Correction."  After discussing the worst stock market crashes in U.S.

12   history, the guide states: "Is there something you can do to protect yourself?  Yes.

13   You can invest your hard-earned money in gold and silver."

14   232.   During the Relevant Period, Red Rock, by and through its sales

15   representatives and other agents, routinely provided prospective customers with a

16   copy of the company's Gold and Silver Guide containing investment advice,

17   including:

18   So how can you diversify into gold, silver, and other precious metals?

19   You could use some of your savings to make a purchase right now.

20   But a better way [is] to use money already in a 401(k) or IRA account

21   to purchase gold and silver. . . .

22   **b.  Defendants' Representations About Metals Purchases**

23   233.   Defendants, directly or by and through Red Rock's sales representatives

24   or other agents, engaged in a scheme to defraud and made material

25   misrepresentations and material omissions in providing investment advice to

26   customers to transfer their Qualified Retirement Savings, including selling their

27   securities, to purchase commodities and commodity contracts in the form of RTH

28

1   coins from Red Rock.

2       234.   During the Relevant Period, Defendants directly or by and through Red

3   Rock's sales representatives or other agents, willfully engaged in a scheme to defraud

4   by:

5       a)   Advising prospective customers that precious metals can

6         protect retirement savings from stock market crashes and severe

7         market corrections, and that customers can profit by purchasing

8         precious metals including the RTH coin;

9       b)   Steering a majority of all customers into the RTH coin, and

10        counseling sales representatives that were not recommending

11        the RTH coin which carried a high mark-up; and

12      c)   Misrepresenting the mark-up on its premium coins in its

13        Transaction Agreements, misleading customers about the mark-

14        ups by routinely telling customers that Red Rock "charge[s] one

15        to five percent above our costs on common bullion assets,"

16        despite knowing that the company steered consumers into

17        "premium" coins including the RTH coin, with mark-ups above

18        1% to 5% and failing to disclose the actual mark-ups on the

19        RTH coins.

20      235.   Red Rock, directly or by and through its sales representatives or other

21  agents, including Spencer, made material misrepresentations and material omissions

22  regarding Qualified Retirement Savings, including securities, as compared to

23  precious metals which included, but were not limited to, misleading statements to

24  instill fear in retirement-aged customers about their Qualified Retirement Savings to

25  justify the advice to liquidate securities and transfer these funds to Defendants for the

26  purchase of precious metals, while misrepresenting and failing to disclose the mark-

27  ups charged on the RTH coins.

28

236.   Spencer and Red Rock, directly or by and through Red Rock's sales representatives or other agents, made material misrepresentations and material omissions regarding the company and its sales representatives or other agents' experience and expertise which included, but were not limited to, the following:

   a)  Misrepresented to prospective customers that Spencer had a Ph.D. in economics when he did not;

   b)  Misrepresented to prospective customers that Spencer had 25 years of experience in precious metals when he did not;

   c)  Misrepresented that Red Rock's leadership team, which included Kelly and  Spencer, "have worked tirelessly" on the #1 TSP Playbook and that they have "spent nights countless [sic] hours pouring over pages of Thrift Savings Plan rules and regulations so as to make your options clear and easy to understand" when they did not.

   d)  Represented that Red Rock had 10 years in business, and failed to clarify that it began operating in the precious metals industry in 2016;

   e)  Misrepresented that Red Rock was an investment firm as opposed to a "retail company," when, in fact, it was a retail company; and

   f)  Misrepresented to customers and prospective customers that Red Rock had a "direct relationship" with "the mints" and an "exclusive relationship" with the RCM, and as such save their clients' money on mark-ups and lack of a middleman, when, in fact, no such relationships existed and Red Rock paid the "middleman"—BME—an additional markup.

237.   Red Rock, directly or by and through its sales representatives or other

agents, made material omissions regarding their compensation structure.  In light of the other statements made regarding transferring funds from Qualified Retirement Savings to purchase precious metals, Red Rock and its agents failed to reveal conflicts of interest arising from Red Rock's sales representatives' profit share, commissions, and other compensation being tied to the amount of funds from customers' Qualified Retirement Savings invested in precious metals including the RTH coins.

238.   Kelly, Spencer, and Red Rock, directly or by and through Red Rock's sales representatives or other agents, made material misrepresentations regarding their mark-ups and fees, which included, but were not limited to, the following:

a)  Spencer and other Red Rock staff misled customers about the mark-ups by routinely telling customers that Red Rock "charge[s] one to five percent above our costs on common bullion assets," despite knowing and failing to disclose that they were steering customers into "premium" products, specifically silver and gold RTH coins, which carried significantly higher mark-ups above 1% to 5%;

b)  Misrepresented how the company makes its money or commissions.  For example, in August 2021, when prospective California Customer 2 asked how Red Rock makes its money or commission, a Red Rock sales representative told prospective California Customer 2 about the depository and administrative fees, but did not disclose the mark-up or commissions, even when this prospective customer asked the sales representative to confirm there wasn't a percentage the company makes on the transaction.  The sales representative

1  stated, "No, it's not like the financial institution that gets a
2  percentage of your whole portfolio if it performs or not";

3     c)  Misrepresented, in its Transaction Agreements until December
4  of 2021, that the mark-up on Red Rock's premium coins
5  typically ranges between 4% and 29% when in reality, the
6  mark-up on the majority of the premium coins it sold, including
7  the silver and gold RTH coins, carried mark-ups of
8  approximately 92% to 130%.  Kelly chose the mark-ups on the
9  sale of the RTH coins and had the authority and responsibility
10  for determining what Red Rock told its clients and prospective
11  clients about the mark-ups and fees on the RTH coins;

12     d)  Misrepresented in its December 2021 revised Transaction
13  Agreement that the mark-up on premium coins can range from
14  5% to 120%, when in reality, the mark-ups on the silver RTH
15  coins routinely exceeded 120%; and

16     e)  Failed to disclose the mark-up on the gold and silver RTH coins
17  to prospective customers during the Relevant Period.

18     239.  Spencer and Red Rock, directly or by and through Red Rock's sales
19  representatives or other agents, made material misrepresentations regarding the
20  precious metals it sold to customers, which included, but were not limited to, the
21  following:

22     a)  Misrepresented that the value of the silver RTH coin was set by
23  the RCM when it was not. For example, Spencer
24  misrepresented to at least one customer that the value of the
25  silver RTH coin was set by the RCM, and as such the re-
26  salability and ROI were exceptionally, comparatively much
27  stronger than the common one oz. assets, when it was not;

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST ALL DEFENDANTS

b) Misrepresented there was a limited mintage population of the
silver RTH coins when there was not. Spencer under reported
the mintage population of the silver RTH coin to at least one
customer to make it appear as if the product justified a higher
price;

c) Misrepresented to customers that the metals they bought from
Red Rock were discounted when a discount was not applied;
and

d) Misrepresented the retail value of customers' precious metals in
its transaction agreements, on confirmation calls, and after the
customer purchased the metals, lulling customers to keep their
funds invested in the metals.  For example, Spencer claimed
that the current retail value is based on the metals' spot price
plus market demand, investor demand, and supply and demand
when it is not.

240.   Through this scheme to defraud and these material misrepresentations
and omissions, Defendants solicited customers to sell securities to ultimately gain
access to those funds through the sale of RTH coins.  The profits obtained by Red
Rock and compensation paid to their sales representatives or other agents were
related to the amount of Qualified Retirement Savings, including securities, that
convinced customers to liquidate.  During the Relevant Period, Red Rock sold more
than $69.5 million worth of the RTH coins to customers nationwide.  Customers paid
approximately $39 million more than Red Rock's costs on the RTH coins with
average markups ranging from 92-130%.

241.   The practices discussed in this section resulted in almost immediate
substantial losses for customers due to Defendants' scheme to defraud and material
misrepresentations and omissions.

1    242.   The foregoing conduct in relation to all of Red Rock's offers and sales

2 during the Relevant Period (both cash and SDIRA sales) also violates California state

3 law prohibiting schemes to defraud and material misrepresentations or omissions in

4 connection with the offer, purchase, or sale of commodities.

5           **14.  Facts Relating to Claims Brought by the State of Hawaii**

6    243.   Under Hawaii Revised Statutes § 485A-501(a)(2), it is unlawful for a

7 person, in connection with the offer, sale, or purchase of a security, directly or

8 indirectly, to make an untrue statement of a material fact or fail to state a material fact

9 necessary to make the statements made, in light of the circumstance under which they

10 were made, not misleading.

11          **a.  Defendants' Representations to Hawaii Customer 1**

12   244.   From February 2020 through March 24, 2020, Defendants, directly or by

13 and through Red Rock's sales representatives or other agents, made material

14 misrepresentations and omissions to Hawaii Customer 1, age 72 at the time, which

15 resulted in Hawaii Customer 1 liquidating a portion of his TSP account that held

16 securities, including his Common Stock Index Investment (C) Fund and Small

17 Capitalization Stock Index Investment (S) Fund, in order to purchase precious metals

18 from Red Rock.

19   245.   Defendants, directly or by and through Red Rock's sales representatives

20 or other agents, misrepresented the mark-ups in Red Rock's Transaction Agreement

21 provided to Hawaii Customer 1, which states that for certain "premium" precious

22 metals, including the silver and gold RTH coins, "[t]he difference between the

23 Purchase Price Client pays for Products under a Purchase Order and the price that

24 Red Rock actually pays for the Products purchased by Client under such Purchase

25 Order" typically ranges "between 4% and 29%[,]" when in reality, a majority of the

26 premium coins Red Rock sold, including the silver and gold RTH coins, routinely

27 carried mark-ups of approximately 100% to 130%.

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

246. On February 28, 2020, a Red Rock sales representative told Hawaii Customer 1 that Spencer had a Ph.D. in economics when, in fact, he did not.

247. During the same call, Spencer told Hawaii Customer 1 that:

    a) He had been assisting clients with TSP accounts over the "last 25 years," when, in fact, he did not have 25 years of experience in the metals business;

    b) Red Rock "work[s] very closely with the TSP for, gosh, well over a decade at this point," when, in fact, Red Rock did not begin operating in the precious metals business until 2016; and

    c) "95% of our clients are TSP account holders."

248. Spencer testified in deposition on March 16, 2022, that: (a) he did not know the number of Red Rock's customers who used TSP assets to purchase coins or metals; (b) any number he provided of TSP customers would be a guess, but the number would not be substantial; and (c) he did not believe the number of TSP customers exceeded one-third of Red Rock's total customer base.

249. On March 5, 2020, Spencer told Hawaii Customer 1 that, with a $100,000 metals purchase, "you're also going to get 5% in more metal added to the account, so that's $5,000 in additional metal that we are going to factor into the trade." Hawaii Customer 1 did not receive any additional metal from Red Rock. Spencer did not disclose a 129% mark-up Red Rock charged Hawaii Customer 1 on the silver RTH coins he purchased, which caused Hawaii Customer 1 to immediately suffer a substantial loss on his investment.

250. As a result of the foregoing material misrepresentations and omissions, on March 24, 2020, Hawaii Customer 1 paid Red Rock $84,932.05 for 3,630 silver RTH coins. Red Rock charged a mark-up of approximately 129% on the silver RTH coins Hawaii Customer 1 purchased.

251. At no time prior to the sale did Defendants disclose to Hawaii Customer

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST ALL DEFENDANTS

1   1 that Red Rock would charge an approximately 129% mark-up on the silver RTH

2   coins he purchased.

3   252.   As a result of the mispresented and undisclosed mark-up, Red Rock kept

4   $47,833.45 of the $84,932.05 Hawaii Customer 1 paid, while paying BME only

5   $37,098.60 for the RTH coins sold to Hawaii Customer 1.

6   253.   Defendants' material misrepresentations and omissions were made in

7   connection with the sale of securities where Red Rock's sales representatives or other

8   agents assisted Hawaii Customer 1 with liquidating the securities held in his TSP

9   account and setting up his SDIRA with a third-party custodian in order to purchase

10   precious metals from Red Rock.

11   254.   Hawaii Customer 1 had no experience purchasing precious metals at the

12   time he purchased silver RTH coins from Red Rock.

13                   **b.  Defendants' Representations to Hawaii Customer 2**

14   255.   From late 2019 through March 25, 2020, Defendants, directly or by and

15   through Red Rock's sales representatives or other agents, made material

16   misrepresentations and omissions to Hawaii Customer 2, age 73 at the time, which

17   resulted in Hawaii Customer 2 liquidating a portion of her TSP account that held

18   securities, including her Common Stock Index Investment (C) Fund and Lifestyle

19   Investment (L) Fund, in order to purchase precious metals from Red Rock.

20   256.   Defendants, directly or by and through Red Rock's sales representatives

21   or other agents, misrepresented the mark-ups in Red Rock's Transaction Agreement

22   provided to Hawaii Customer 2, which states that for certain "premium" precious

23   metals, including the silver and gold RTH coins, "[t]he difference between the

24   Purchase Price Client pays for Products under a Purchase Order and the price that

25   Red Rock actually pays for the Products purchased by Client under such Purchase

26   Order" typically "ranges between 4% to 29%[,]" when in reality, a majority of the

27   premium coins Red Rock sold, including the silver and gold RTH coins, routinely

28

1    carried mark-ups of approximately 100% to 130%.

2         257.   On December 17, 2019, when confirming Hawaii Customer 2's purchase

3    of silver and gold RTH coins, Spencer told Hawaii Customer 2 "we only work with

4    the mints directly" and "we have an exclusive arrangement with all the mints, as a

5    matter of fact."  In reality, Red Rock did not work with the mints directly and did not

6    have exclusive relationships with the mints.  Rather, Red Rock bought all of the RTH

7    coins that it sold to its customers from BME.

8         258.   As a result of the foregoing material misrepresentations and omissions,

9    on December 17, 2019, Hawaii Customer 2 paid Red Rock $47,618.38 for 1,290

10   silver RTH coins and 40 gold RTH coins.  Red Rock charged mark-ups of

11   approximately 120% on both the silver and gold RTH coins Hawaii Customer 2

12   purchased in December 2019.

13        259.   At no time prior to the sale did Defendants disclose to Hawaii Customer

14   2 that Red Rock would charge an approximately 120% mark-up on both the silver

15   and gold RTH coins she purchased in December 2019.

16        260.   As a result of the misrepresented and undisclosed mark-ups, Red Rock

17   kept $26,015.98 of the $47,618.38 Hawaii Customer 2 paid, while paying BME only

18   $21,602.40 for the RTH coins sold to Hawaii Customer 2.

19        261.   Thereafter, on March 25, 2020, Hawaii Customer 2 paid Red Rock

20   $22,010.69 for 225 silver RTH coins and 40 gold RTH coins.  Red Rock charged

21   mark-ups of approximately 134% on the silver RTH coins and approximately 120%

22   on the gold RTH coins Hawaii Customer 2 purchased in March 2020.

23        262.   At no time prior to the sale did Defendants disclose to Hawaii Customer

24   2 that Red Rock would charge mark-ups of approximately 134% and approximately

25   120% on the silver and gold RTH coins she purchased in March 2020.

26        263.   As a result of the misrepresented and undisclosed mark-ups, Red Rock

27   kept $12,147.84 of the $22,010.69 Hawaii Customer 2 paid, while paying BME only

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

$9,862.85 for the RTH coins sold to Hawaii Customer 2 in March 2020.

264.   Defendants' material misrepresentations and omissions were made in connection with the sale of securities where Red Rock's sales representatives or other agents assisted Hawaii Customer 2 with filling out paperwork to liquidate the securities held in her TSP account and setting up her SDIRA with a third-party custodian in order to purchase precious metals from Red Rock.

265.   Hawaii Customer 2 had no experience purchasing precious metals at the time she first purchased RTH coins from Red Rock in December 2019.

266.   As a result of the foregoing acts, misrepresentations, and omissions, Hawaii Customers 1 and 2 were deprived of material information when deciding whether to liquidate their securities to purchase the RTH coins from Red Rock.

**B.   Conclusions of Law**

**1.   Jurisdiction and Venue**

267.   This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

268.   Section 6d(1) of the Act, 7 U.S.C. § 13a-2(1), authorizes the States to bring a suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorneys General and/or Securities Administrator of a State, or such other official that a State may designate, that the interests of the residents of the State have been, are being, or may be threatened or adversely affected because of violations of the Act or CFTC Regulations.

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

269.   Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because the Defendants reside in this jurisdiction and the acts and practices in violation of the Act occurred within this District.

**2.   Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2023)**

270.   By the conduct described above in paragraphs 91-218, Red Rock, by and through its officers, employees, and agents, including Spencer, and Spencer directly, in connection with contracts of sale of commodities in interstate commerce, intentionally or recklessly:  (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; (2) made, or attempted to make, any untrue or misleading statements of material fact or omissions of material fact; and/or (3) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon their customers in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

271.   During the Relevant Period, Kelly controlled Red Rock, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Red Rock's act or acts in violation of the Act and Regulations.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Kelly is liable for Red Rock's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

272.   The foregoing acts, omissions, and failures of Kelly, Spencer, and other officers, employees, and agents of Red Rock occurred within the scope of their employment, agency, or office with Red Rock.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023), Red Rock is liable for the acts, omissions, and failures of Kelly, Spencer, and other officers, employees, and agents of Red Rock in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

### 3. State Law Violations

273.   By the conduct described in paragraphs 91-266 above, Defendants violated various State laws prohibiting employing any artifice, or scheme to defraud in connection with the offer, purchase, or sale of commodities, and Defendants Red Rock and Spencer violated various State laws prohibiting:  (1) unlicensed investment advice; (2) investment advisers from employing a device, scheme or artifice to defraud or engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit; (3) making material misrepresentations or omissions in connection with the offer, purchase, or sale of securities; (4) making material misrepresentations or omissions in connection with the offer, purchase, or sale of commodities; and (5) financial exploitation of the elderly in violation of the following:

    a)    Sections 25230, 25235, and 29536 of the California Corporations Code; and

    b)    Sections 485A-501(a)(2) and 485A-603.5 of the Hawaii Revised Statutes.

(collectively the "State Law")

274.   The facts, misrepresentations, and omissions described above are material because there is a substantial likelihood that a reasonable investor would consider them important in deciding whether to sell securities and/or invest in the coins sold by Red Rock.

275.   By the conduct described above, Kelly controlled Red Rock, directly or indirectly, and/or induced the violations or substantially or materially assisted Red Rock's act or acts in violation of the State Law; this conduct was not undertaken in good faith or was willful or knowing.  Therefore, Kelly is liable for Red Rock's violations of the State Law.

276.   Spencer substantially or materially assisted in Red Rock's act or acts in

violation of the State Law; this conduct was not undertaken in good faith or was willful or knowing.  Therefore, Spencer is liable for Red Rock's violations of the State Law.

277.   Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations and the State Law.

## IV.   INJUNCTIVE RELIEF

### A.   Permanent Injunction

**IT IS HEREBY ORDERED THAT:**

278.   Based upon and in connection with the foregoing conduct, pursuant to Sections 6c and 6d of the Act, 7 U.S.C. §§ 13a-1, 13a-2, Defendants are permanently restrained, enjoined and prohibited from, directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, intentionally or recklessly:  (1) using or employing, or attempting to use or employ, manipulative devices, schemes, or artifices to defraud; (2) making, or attempting to make, any untrue or misleading statements of material fact or omissions of material fact; or (3) engaging, or attempting to engage, in acts, practices, or courses of business, which operate or would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3)17 C.F.R. § 180.1(a)(1)-(3) (2023).

279.   Based upon and in connection with the foregoing conduct, pursuant to the laws of the States, Defendants are also permanently restrained, enjoined and prohibited from directly or indirectly engaging in any conduct in violation of the State Law described in paragraph 273.

280.   Defendants are also permanently restrained, enjoined and prohibited from directly or indirectly:

a) Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

b) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2023), or Precious Metals that are commodities (as that term is defined herein), for accounts held in the name of any Defendant or for any account in which any Defendant has a direct or indirect interest;

c) Having any commodity interests, or Precious Metals that are commodities, traded on any Defendant's behalf;

d) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or Precious Metals that are commodities;

e) Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or Precious Metals that are commodities;

f) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2023); and/or

g) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2023)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST ALL DEFENDANTS

### B.   State Bar Orders

281.   Defendants consent, without admitting or denying the allegations to be contained therein, to the publication of this Consent Order or to the entry of an administrative order by the States that ban or bar Defendants from participation in the commodities or securities industries, including, but not limited to, any position of employment, management, or control of any broker-dealer, investment adviser, or commodity advisor.

282.   Defendants consent and agree to the issuance of administrative bar orders in the form set forth in Attachment 1 to this Consent Order.

283.   Defendants consent to waive the right to any notice or hearings, and to any reconsideration, appeal, or other right to review which may be afforded by the applicable laws of the States, with full knowledge of their rights, voluntarily waive the right to an adjudicative hearing in accordance with applicable state laws, as well as any other appeal rights found therein.  Defendants waive the issuance, lawful service and receipt of any notice of allegations and charges against Defendants and stipulate to the jurisdiction of the state securities regulators in California and Hawaii.

284.   After being fully and adequately apprised of the right to appeal as set forth in applicable state laws, Defendants knowingly and voluntarily consent to waive the right to any notice or hearings, and to any reconsideration, appeal, or other right to review which may be afforded by the applicable laws of California and/or Hawaii. Defendants expressly waive any requirement for the filing of a pleading or accusation.  By waiving such rights, Defendants consent to the finality of the administrative bar orders issued by the States as referenced herein.

## V.   STATUTORY AND EQUITABLE RELIEF

### A.   Civil Monetary Penalties

**IT IS HEREBY ORDERED THAT:**

285.   Red Rock shall pay to the Plaintiffs a civil monetary penalty in the

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

amount of ten million dollars ($10,000,000) ("Red Rock's CMP Obligation") within 30 days of the date of entry of this Consent Order.  If Red Rock's CMP Obligation is not paid in full within 30 days of the date of entry of this Consent Order, then post-judgment interest shall accrue on the unpaid portion of Red Rock's CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

286.   Kelly shall pay to the Plaintiffs a civil monetary penalty in the amount of one million five hundred thousand dollars ($1,500,000) ("Kelly's CMP Obligation") within 30 days of the date of entry of this Consent Order.  If Kelly's CMP Obligation is not paid in full within 30 days of the date of entry of this Consent Order, then post-judgment interest shall accrue on the unpaid portion of Kelly's CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

287.   Spencer shall pay to the Plaintiffs a civil monetary penalty in the amount of seven hundred fifty thousand dollars ($750,000) ("Spencer's CMP Obligation") within 30 days of the date of entry of this Consent Order.  If Spencer's CMP Obligation is not paid in full within 30 days of the date of entry of this Consent Order, then post-judgment interest shall accrue on the unpaid portion of Spencer's CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

288.   Defendants shall receive a dollar-for-dollar credit against their respective CMP Obligations for any penalties paid in the matter *SEC v. Red Rock Secured, LLC, et al.*, Case No. 2:23-cv-03682-RGK-PVC (C.D. Cal. May 15, 2023) (the "SEC Action").  Within ten days of any payment in the SEC Action, the paying Defendant

1   shall, under a cover letter that identifies the name and docket number of this

2   proceeding, transmit copies of the form of payment to the Chief Financial Officer,

3   Commodity Futures Trading Commission, and Rick Glaser, Deputy Director,

4   Commodity Futures Trading Commission, at 1155 21st Street, NW, Washington,

5   D.C. 20581, and counsel of record in this proceeding for the DFPI.

6        289.   If not offset by payments in the SEC Action, any outstanding portions of

7   Defendants' CMP Obligations and any post-judgment interest, shall be paid by

8   electronic funds transfer, U.S. postal money order, certified check, bank cashier's

9   check, or bank money order.  If payment is to be made other than by electronic funds

10  transfer, then the payment shall be made payable to the Commodity Futures Trading

11  Commission and sent to the address below:

12       MMAC/ESC/AMK326

13       Commodity Futures Trading Commission

14       6500 S. MacArthur Blvd.

15       HQ Room 266

16       Oklahoma City, OK 73169

17       9-amz-ar-cftc@faa.gov

18       290.   If payment by electronic funds transfer is chosen, Defendants shall

19  contact the Federal Aviation Administration at the email address above to receive

20  payment instructions and shall fully comply with those instructions.  Defendants shall

21  accompany payment of their respective CMP Obligations with a cover letter that

22  identifies the Defendant and the name and docket number of this proceeding.

23  Defendants shall simultaneously transmit copies of the cover letter and the form of

24  payment to the Chief Financial Officer, Commodity Futures Trading Commission,

25  Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and counsel

26  of record in this proceeding for the DFPI.

27

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

## B.   Restitution

**IT IS HEREBY ORDERED THAT:**

291.   Red Rock shall pay restitution in the amount of thirty-eight million, nine hundred eighty-four thousand, three hundred thirteen dollars and ninety cents ($38,984,313.90) ("Restitution Obligation").  If the Restitution Obligation is not paid within 30 days of the date of entry of this Consent Order, post-judgment interest shall accrue on the unpaid portion of the Restitution Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

292.   Red Rock shall receive a dollar-for-dollar credit against its Restitution Obligation for any restitution or disgorgement paid in the SEC Action.  Within ten days of any payment in the SEC Action, Red Rock shall, under a cover letter that identifies the name and docket number of this proceeding, transmit copies of the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, and Rick Glaser, Deputy Director, Commodity Futures Trading Commission, at 1155 21st Street, NW, Washington, D.C. 20581, and counsel of record in this proceeding for the DFPI.

293.   If not offset by payments in the SEC Action, any outstanding portion of Red Rock's Restitution Obligation and any post-judgment interest, shall be paid in accordance with the procedures set forth in Section D below.

294.   The amounts payable to each Red Rock customer shall not limit the ability of any customer from proving that a greater amount is owed from Red Rock or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

295.   To the extent that any funds accrue to the U.S. Treasury for satisfaction of Red Rock's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth in Section D below.

1       **C.**    **Disgorgement**

2 **IT IS HEREBY ORDERED THAT:**

3      296.    Kelly shall pay disgorgement in the amount of two million eight hundred

4 fifty thousand dollars ($2,850,000) representing the gains he received in connection

5 with the violations described above ("Kelly's Disgorgement Obligation") within 30

6 days of the date of entry of this Consent Order. If Kelly's Disgorgement Obligation

7 is not paid in full within 30 days of the date of entry of this Consent Order, post-

8 judgment interest shall accrue on the unpaid portion of Kelly's Disgorgement

9 Obligation beginning on the date of entry of this Consent Order and shall be

10 determined by using the Treasury Bill rate prevailing on the date of entry of this

11 Consent Order pursuant to 28 U.S.C. § 1961.

12      297.    Spencer shall pay disgorgement in the amount of two million two

13 hundred twenty-five thousand dollars ($2,250,000) representing the gains he received

14 in connection with the violations described above ("Spencer's Disgorgement

15 Obligation") within 30 days of the date of entry of this Consent Order. If Spencer's

16 Disgorgement Obligation is not paid in full within 30 days of the date of entry of this

17 Consent Order, post-judgment interest shall accrue on the unpaid portion of Spencer's

18 Disgorgement Obligation beginning on the date of entry of this Consent Order and

19 shall be determined by using the Treasury Bill rate prevailing on the date of entry of

20 this Consent Order pursuant to 28 U.S.C. § 1961.

21      298.    Kelly and Spencer shall receive a dollar-for-dollar credit against their

22 respective Disgorgement Obligations for any disgorgement paid in the SEC Action.

23 Within ten days of any payment in the SEC Action, Kelly or Spencer shall, under a

24 cover letter that identifies the name and docket number of this proceeding, transmit

25 copies of the form of payment to the Chief Financial Officer, Commodity Futures

26 Trading Commission, and Rick Glaser, Deputy Director, Commodity Futures Trading

27 Commission, at 1155 21st Street, NW, Washington, D.C. 20581, and counsel of

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

1   record in this proceeding for the DFPI.

2       299.   If not offset by payments in the SEC Action, any outstanding portions of

3   Kelly's or Spencer's Disgorgement Obligation and any post-judgment interest, shall

4   be paid in accordance with the procedures set forth in Section D below.

5       300.   To the extent that any funds accrue to the U.S. Treasury for satisfaction

6   of Kelly's or Spencer's Disgorgement Obligation, such funds shall be transferred to

7   the Monitor for disbursement in accordance with the procedures set forth in Section

8   D below.

9       **D.   Payment and Distribution of Restitution and Disgorgement**

10          **Obligations**

11   **IT IS HEREBY ORDERED THAT:**

12       301.   To effect payment of Red Rock's Restitution Obligation and Kelly's and

13   Spencer's Disgorgement Obligations (collectively, the "R&D Obligations") and the

14   distribution of any payments to Red Rock's RTH customers, the Court appoints the

15   National Futures Association ("NFA") as Monitor ("Monitor").  The Monitor shall

16   receive payments on the R&D Obligations from Defendants and make distributions

17   as set forth below.  Because the Monitor is acting as an officer of this Court in

18   performing these services, the NFA shall not be liable for any action or inaction

19   arising from NFA's appointment as Monitor, other than actions involving fraud.

20       302.   Defendants shall make R&D Obligations payments, and any post-

21   judgment interest payments, under this Consent Order to the Monitor in the name of

22   "Red Rock Secured Restitution Fund" and shall send such payments by electronic

23   funds transfer, or by U.S. postal money order, certified check, bank cashier's check,

24   or bank money order, to the Office of Administration, National Futures Association,

25   320 South Canal Street, 24th Floor, Chicago, Illinois 60606 under cover letter that

26   identifies the paying Defendant and the name and docket number of this proceeding.

27   Defendants shall simultaneously transmit copies of the cover letter and the form of

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

1  payment to the Chief Financial Officer, Commodity Futures Trading Commission,

2  Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and counsel

3  of record in this proceeding for the DFPI.

4      303.  The Monitor shall oversee the R&D Obligations and shall have the

5  discretion to determine the manner of distribution of such funds in an equitable

6  fashion to Red Rock's RTH customers identified by Plaintiffs or may defer

7  distribution until such time as the Monitor deems appropriate.  In the event that the

8  amount of R&D Obligations payments to the Monitor are of a *de minimis* nature such

9  that the Monitor determines that the administrative cost of making a distribution to

10  eligible customers is impractical, the Monitor may, in its discretion, treat such

11  payments as civil monetary penalty payments, which the Monitor shall forward to the

12  CFTC.

13      304.  Defendants shall cooperate with the Monitor as appropriate to provide

14  such information as the Monitor deems necessary and appropriate to identify the Red

15  Rock customers to whom the Monitor, in its sole discretion, may determine to include

16  in any plan for distribution of any R&D Obligations payments.  Defendants shall

17  execute any documents necessary to release funds that they hold in any repository,

18  bank, investment or other financial institution, wherever located, in order to make

19  partial or total payment toward the R&D Obligations.

20      305.  The Monitor shall provide Plaintiffs at the beginning of each calendar

21  year with a report detailing the disbursement of funds to Red Rock's customers

22  during the previous year.  The Monitor shall transmit this report under a cover letter

23  that identifies the name and docket number of this proceeding to the Chief Financial

24  Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st

25  Street, NW, Washington, D.C. 20581, and counsel of record in this proceeding for the

26  DFPI.

27      306.  The Monitor shall provide Plaintiffs at the beginning of each calendar

28

1   year with a report detailing the disbursement of funds to Red Rock customers.  The

2   Monitor shall transmit this report under a cover letter that identifies the name and

3   docket number of this proceeding to the Chief Financial Officer, Commodity Futures

4   Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington,

5   D.C. 20581, and counsel of record in this proceeding for the DFPI.

6   ### E.   Provisions Related to Monetary Sanctions

7   307.   Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each Red

8   Rock customer who suffered a loss is explicitly made an intended third-party

9   beneficiary of this Consent Order and may seek to enforce obedience of this Consent

10  Order to obtain satisfaction of any portion of the R&D Obligations that has not been

11  paid by Defendants to ensure continued compliance with any provision of this

12  Consent Order and to hold Defendants in contempt for any violations of any

13  provision of this Consent Order.

14  308.   Partial Satisfaction:  Acceptance by the CFTC, DFPI, SEB, or the

15  Monitor of any partial payment of the Defendants' R&D Obligations or CMP

16  Obligations shall not be deemed a waiver of their obligation to make further

17  payments pursuant to this Consent Order, or a waiver of Plaintiffs' right to seek to

18  compel payment of any remaining balance.

19  ### VI.   MISCELLANEOUS PROVISIONS

20  309.   Until such time as Defendants satisfy in full their R&D Obligations and

21  CMP Obligations under this Consent Order, upon the commencement by or against

22  any Defendant of insolvency, receivership, or bankruptcy proceedings or any other

23  proceedings for the settlement of Defendant's debts, all notices to creditors required

24  to be furnished to the Commission under Title 11 of the United States Code or other

25  applicable law with respect to such insolvency, receivership bankruptcy or other

26  proceedings, shall be sent to the address below:

27  Secretary of the Commission

28

Office of the General Counsel

Commodity Futures Trading Commission

Three Lafayette Centre

1155 21st Street N.W.

Washington, DC 20581

All notices required to be sent to the States shall be sent to their counsel of record in these proceedings.

310.   Notice:  All notices required to be given by any provision in this Consent Order, except as set forth in the ¶ 289, shall be sent certified mail, return receipt requested, as follows:

    a)   Notice to CFTC, which shall reference the name and docket number of this action:

        Rick Glaser

        Deputy Director

        1155 21st Street NW

        Washington, DC 20581

        rglaser@cftc.gov

    b)   Notice to States is required to be sent to the respective counsel of record for the States in these proceedings via email and certified mail, return receipt requested;

    c)   Notice to Defendant Red Rock:

        Joseph P. Costa

        CostaLaw

        17383 Sunset Boulevard, Suite A-430

        Pacific Palisades, California 90272

        joseph.costa@costalaw.com

    d)   Notice to Defendant Kelly:

1    Marc S. Williams

2    Cohen Williams LLP

3    724 South Spring Street, 9th Floor

4    Los Angeles, CA 90014

5    mwilliams@cohen-williams.com

6    e)    Notice to Defendant Spencer:

7    Rebecca Torrey

8    The Torrey Firm

9    1626 Montana Ave, Suite 647

10    Santa Monica, CA 90403

11    rebecca@torreyfirm.com

12    311.    Change of Address/Phone:  Until such time as Defendants satisfy in full
13   their R&D Obligations and CMP Obligations as set forth in this Consent Order, the
14   Defendants shall provide written notice to the CFTC by certified mail of any change
15   to their telephone number and mailing address within ten calendar days of the change.

16    312.    Entire Agreement and Amendments:  This Consent Order incorporates
17   all of the terms and conditions of the settlement among the parties hereto to date.
18   Nothing shall serve to amend or modify this Consent Order in any respect
19   whatsoever, unless:  (a) reduced to writing; (b) signed by all parties hereto; and
20   (c) approved by order of this Court.

21    313.    Invalidation:  If any provision of this Consent Order or if the application
22   of any provision or circumstance is held invalid, then the remainder of this Consent
23   Order and the application of the provision to any other person or circumstance shall
24   not be affected by the holding.

25    314.    Waiver:  The failure of any party to this Consent Order or of any
26   customer at any time to require performance of any provision of this Consent Order
27   shall in no manner affect the right of the party or customer at a later time to enforce

28

CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST ALL DEFENDANTS

the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

315. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by any Defendant to modify or for relief from the terms of this Consent Order.

316. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon the following persons who receive actual notice of this Consent Order, by personal service or otherwise: (1) Defendants; (2) any officer, agent, servant, employee, or attorney of any Defendant; and (3) any other persons who are in active concert or participation with any persons described in subsections (1) and (2) above.

317. Authority: Defendant Kelly hereby warrants that he is an owner and the CEO of Defendant Red Rock, that this Consent Order has been duly authorized by Defendant Red Rock, and he has been duly empowered to sign and submit this Consent Order on behalf of Defendant Red Rock.

318. Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

319. Contempt: Defendants understand that the terms of the Consent Order

1   are enforceable through contempt proceedings to the fullest extent of applicable law,

2   and that, in any such proceedings, they may not challenge the validity of this Consent

3   Order.

4        320.   Defendants agree that, for the purposes of exceptions to discharge set

5   forth in Sections 523, 1141(d)(6), and 1192 of the Bankruptcy Code, 11 U.S.C.

6   §§ 523, 1141(d)(6), 1192, the findings in this Consent Order are true and admitted

7   and any debt for restitution, disgorgement, civil penalty, or any other amounts due by

8   Defendants under this Consent Order or any other judgment, order, consent order,

9   decree, or settlement agreement entered in connection with this proceeding, is a debt

10   for violation of state securities laws, including but not limited to securities fraud, as

11   set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C §523(a)(19), and

12   Section 523(a)(2) of the Bankruptcy Code, 11 U.S.C. §523(a)(2), and incorporated by

13   reference under Section 1192 of the Bankruptcy Code, 11 U.S.C § 1192.

14        321.   Agreements and Undertakings:  Defendants shall comply with all of the

15   undertakings and agreements set forth in this Consent Order.

16        Because the parties have resolved this matter in its entirety, the Court

17   VACATES all future dates associated with this case and INSTRUCTS the Clerk to

18   close the case. There being no just reason for delay, the Clerk of the Court is further

19   directed to enter this *Consent Order of Permanent Injunction, Civil Monetary*

20   *Penalty, and Other Statutory and Equitable Relief Against All Defendants.*

21                       * * * * * * *

22   **IT IS SO ORDERED.**

23   Dated: 4/23/2024

24                                 The Honorable R. Gary Klausner

25                                 United States District Judge

26

27

28

1

**CONSENTED TO AND APPROVED BY:**

2

3

4

_____
RED ROCK SECURED, LLC
By:  Sean L. Kelly

5

6

Dated: _____, 2024

7

8

9

_____
SEAN L. KELLY f/k/a SHADE L.
KELLY-JOHNSON

10

11

Dated: _____, 2024

12

13

14

_____
ANTHONY SPENCER

15

16

Dated: _____, 2024

17

18

19

Approved as to form:

20

21

22

_____
Joseph P. Costa
CostaLaw

23

24

COUNSEL FOR DEFENDANT RED
ROCK SECURED, LLC

25

26

Dated: _____, 2024

27

28

/s/ James A. Garcia
By:  James A. Garcia

COUNSEL FOR COMMODITY
FUTURES TRADING COMMISSION

Dated: April 18, 2024

/s/ Danielle A. Stoumbos
By:  Danielle A. Stoumbos

COUNSEL FOR CALIFORNIA
DEPARTMENT OF FINANCIAL
PROTECTION AND INNOVATION

Dated: April 18, 2024

/s/ Rayni M. Nakamura-Watanabe
By:  Rayni M. Nakamura-Watanabe

COUNSEL FOR STATE OF HAWAII,
DEPARTMENT OF COMMERCE
AND CONSUMER AFFAIRS,
SECURITIES ENFORCEMENT
BRANCH

Dated: April 18, 2024

1

2   _____
    Marc S. Williams
3   Cohen Williams LLP
    COUNSEL FOR DEFENDANT SEAN
4   L. KELLY f/k/a SHADE L. KELLY-
    JOHNSON

5   Dated: _____, 2024

6

7

8   _____
    Rebecca Torrey
9   The Torrey Firm

10  COUNSEL FOR DEFENDANT
    ANTHONY SPENCER

11
    Dated: _____, 2024
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DocuSign Envelope ID: 6179C34A-2823-493B-91AD-C8D8E6A83714

1  **CONSENTED TO AND APPROVED BY:**

2

3  _____

RED ROCK SECURED, LLC

4  By:  Sean L. Kelly

5  Dated: _4/7/2024_____, 2024

6

7

8

9  _____

SEAN L. KELLY f/k/a SHADE L.

10  KELLY-JOHNSON

11  Dated: _4/7/2024_____, 2024

12

13

14

15  _____

ANTHONY SPENCER

16  Dated: _____, 2024

17

18

19  Approved as to form:

20

21

22

23  Joseph P. Costa

CostaLaw

24  COUNSEL FOR DEFENDANT RED

ROCK SECURED, LLC

25  Dated: _April 8_____, 2024

26

27

28

/s/ James A. Garcia

By:  James A. Garcia

COUNSEL FOR COMMODITY

FUTURES TRADING COMMISSION

Dated: _____, 2024

/s/ Danielle A. Stoumbos

By:  Danielle A. Stoumbos

COUNSEL FOR CALIFORNIA

DEPARTMENT OF FINANCIAL

PROTECTION AND INNOVATION

Dated: _____, 2024

/s/ Rayni M. Nakamura-Watanabe

By:  Rayni M. Nakamura-Watanabe

COUNSEL FOR STATE OF HAWAII,

DEPARTMENT OF COMMERCE

AND CONSUMER AFFAIRS,

SECURITIES ENFORCEMENT

BRANCH

Dated: _____, 2024

1

2  Marc S. Williams
   Cohen Williams LLP
3  COUNSEL FOR DEFENDANT SEAN
   L. KELLY f/k/a SHADE L. KELLY-
4  JOHNSON

5  Dated: _April 8_____, 2024

6

7

8
   Rebecca Torrey
9  The Torrey Firm

10 COUNSEL FOR DEFENDANT
   ANTHONY SPENCER
11
   Dated: _____, 2024
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
   CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND
   OTHER STATUTORY AND EQUITABLE RELIEF AGAINST ALL DEFENDANTS

1  **CONSENTED TO AND APPROVED BY:**

2

3  _____   /s/ James A. Garcia

4  RED ROCK SECURED, LLC                By:  James A. Garcia
   By:  Sean L. Kelly

5                                        COUNSEL FOR COMMODITY
                                         FUTURES TRADING COMMISSION
6  Dated: _____, 2024

7                                        Dated: _____, 2024

8

9  _____   /s/ Danielle A. Stoumbos

10 SEAN L. KELLY f/k/a SHADE L.          By:  Danielle A. Stoumbos
   KELLY-JOHNSON

11                                       COUNSEL FOR CALIFORNIA
                                         DEPARTMENT OF FINANCIAL
12 Dated: _____, 2024   PROTECTION AND INNOVATION

13

14 _____   Dated: _____, 2024
   Tony Spencer (Apr 7, 2024 20:52 PDT)
15 ANTHONY SPENCER

16
   Dated: 07/04/24 _____, 2024
17

18
                                         /s/ Rayni M. Nakamura-Watanabe
19 Approved as to form:                  By:  Rayni M. Nakamura-Watanabe

20
                                         COUNSEL FOR STATE OF HAWAII,
21                                       DEPARTMENT OF COMMERCE
                                         AND CONSUMER AFFAIRS,
22 _____   SECURITIES ENFORCEMENT
   Joseph P. Costa                       BRANCH
23 CostaLaw

24 COUNSEL FOR DEFENDANT RED             Dated: _____, 2024
   ROCK SECURED, LLC
25
   Dated: _____, 2024
26

27

28
   _____
   CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER
   STATUTORY AND EQUITABLE RELIEF AGAINST ALL DEFENDANTS

1

2   _____
    Marc S. Williams
3   Cohen Williams LLP
    COUNSEL FOR DEFENDANT SEAN
4   L. KELLY f/k/a SHADE L. KELLY-
    JOHNSON

5   Dated: _____, 2024

6

7

8   _____
    Rebecca Torrey
9   The Torrey Firm

10  COUNSEL FOR DEFENDANT
    ANTHONY SPENCER

11
    Dated: _____April 8_____, 2024
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

1  **Certification Pursuant to Local Rule 5-4.3.4(a)(2)(i)**

2  Pursuant to Civil L.R. 5-4.3.4(a)(2)(i), the filer attests that all other signatories

3  listed, and on whose behalf this filing is submitted, concur in the filing's content and

4  have authorized the filing.

5

6  /s/ James A. Garcia
   JAMES A. GARCIA

7

8  **Certificate of Service**

9  On April 18, 2024, I served a copy of the foregoing *[PROPOSED]*

10 *CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY*

11 *PENALTY, AND OTHER STATUTORY AND EQUITABLE RELIEF*

12 *AGAINST ALL DEFENDANTS* by filing the document electronically via the

13 Court's CM/ECF system, which effects electronic service on counsel who are

14 registered with the CM/ECF system.

15

16 /s/ James A. Garcia
   JAMES A. GARCIA

17

18

19

20

21

22

23

24

25

26

27

28

CFTC, et al. v. Red Rock Secured, LLC, et al. Case No. 2:23-
cv-03680-RGK-PVC

# ATTACHMENT 1

TO

PROPOSED CONSENT ORDER OF PERMANENT
INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER
STATUTORY AND EQUITABLE RELIEF AGAINST ALL
DEFENDANTS

CLOTHILDE V. HEWLETT
Commissioner
MARY ANN SMITH
Deputy Commissioner
SEAN M. ROONEY
Assistant Chief Counsel
DANIELLE A. STOUMBOS (State Bar No. 264784)
Senior Counsel
JARI M. BINDER (State Bar No. 333694)
Counsel
Department of Financial Protection and Innovation
320 West 4th Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046

Attorneys for Complainant

BEFORE THE DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| THE COMMISSIONER OF FINANCIAL | ) |
| PROTECTION AND INNOVATION, | ) ORDER BARRING SEAN LOWELL KELLY |
| | ) f/k/a SHADE L. KELLY-JOHNSON |
| Complainant. | ) FROM ANY POSITION OF EMPLOYMENT, |
| | ) MANAGEMENT OR CONTROL OF ANY |
| v. | ) INVESTMENT ADVISER, BROKER- |
| | ) DEALER OR COMMODITY ADVISER |
| SEAN LOWELL KELLY f/k/a SHADE L. | ) PURSUANT TO CORPORATIONS CODE |
| KELLY-JOHNSON, | ) SECTION 25232.1 |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

The Commissioner (Commissioner) of the Department of Financial Protection and Innovation (DFPI) finds that:

1.    The Commissioner has jurisdiction over the licensing and regulation of investment advisers in California under the Corporate Securities Law of 1968 (CSL) (Cal. Corp. Code, §§ 25000 - 25707)

2.    Sean L. Kelly f/k/a Shade L. Kelly-Johnson (Kelly) was the majority owner and sole

State of California – Department of Financial Protection and Innovation

State of California – Department of Financial Protection and Innovation

1   manager of Red Rock Secured, LLC (Red Rock).

2       3.      On May 15, 2023, the DFPI, U.S. Commodity Futures Trading Commission, and

3   State of Hawaii Department of Commerce and Consumer Affairs, Securities Enforcement Branch

4   (collectively, Plaintiffs) filed a civil complaint in federal court against Red Rock, Kelly and Anthony

5   Spencer. The Complaint sought injunctive and other equitable relief, and the imposition of civil

6   penalties, for violations of the federal Commodity Exchange Act, 7 U.S.C. § 9(1) and CFTC

7   Regulation 180.1, 17 C.F.R. § 180.1 as well as violations of state laws, including California

8   Corporations Code sections 25230, 25235, and 29536.

9       4.      On _____, Kelly and Red Rock consented to entry of a Consent Order of

10  Permanent Injunction and Other Statutory and Equitable Relief Against Defendants (Consent Order)

11  to settle the matters alleged in the Complaint, and all amendments to the Complaint, without a trial

12  on the merits.  The court approved the Consent Order on _____.

13      5.      Pursuant to the terms of the Consent Order, Kelly and Red Rock consented to the

14  entry of this order barring Kelly. In signing the Consent Order, Kelly waived the filing of an

15  accusation pursuant to Government Code sections 11415.40 and 11415.60, as well as the right to a

16  hearing, any reconsideration, appeal, or other right to review provided by the CSL,  the California

17  Administrative Procedure Act, the California Code of Civil Procedure, or any other provision of law.

18      NOW THEREFORE, GOOD CAUSE SHOWING, IT IS ORDERED that:

19      Sean Lowell Kelly f/k/a Shade L. Kelly-Johnson is barred in the State of California from any

20  position of employment, management or control of any investment adviser, broker-dealer, or

21  commodity adviser pursuant to California Corporations Code section 25232.1.

22      This Order is effective as of the date hereof.

23  Dated: March __, 2024              CLOTHILDE V. HEWLETT
24          Los Angeles, California        Commissioner of Financial Protection and Innovation

25
26                    By
27                                          _____
                                           MARY ANN SMITH
28                                          Deputy Commissioner
                                           Enforcement Division

2

ORDER BARRING SEAN LOWELL KELLY f/k/a SHADE L. KELLY-JOHNSON PURSUANT
TO CORPORATIONS CODE SECTION 25232.1

CLOTHILDE V. HEWLETT
Commissioner
MARY ANN SMITH
Deputy Commissioner
SEAN M. ROONEY
Assistant Chief Counsel
DANIELLE A. STOUMBOS (State Bar No. 264784)
Senior Counsel
JARI M. BINDER (State Bar No. 333694)
Counsel
Department of Financial Protection and Innovation
320 West 4th Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046

Attorneys for Complainant

BEFORE THE DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| THE COMMISSIONER OF FINANCIAL PROTECTION AND INNOVATION, | ) ORDER BARRING ANTHONY CHARLES |
| | ) SPENCER FROM ANY POSITION OF |
| Complainant. | ) EMPLOYMENT, MANAGEMENT OR |
| | ) CONTROL OF ANY INVESTMENT |
| v. | ) ADVISER, BROKER-DEALER OR |
| | ) COMMODITY ADVISER PURSUANT TO |
| ANTHONY CHARLES SPENCER, | ) CORPORATIONS CODE SECTION 25232.1 |
| | ) |
| Respondent. | ) |
| | ) |

The Commissioner (Commissioner) of the Department of Financial Protection and

Innovation (DFPI) finds that:

1.      The Commissioner has jurisdiction over the licensing and regulation of investment

advisers in California under the Corporate Securities Law of 1968 (CSL) (Cal. Corp. Code, §§

25000–25707)

2.      Anthony Charles Spencer (Spencer) was a senior account executive for Red Rock

Secured, LLC (Red Rock) from at least 2018 to August of 2022.

State of California – Department of Financial Protection and Innovation

3.       On May 15, 2023, the DFPI, U.S. Commodity Futures Trading Commission, and State of Hawaii Department of Commerce and Consumer Affairs, Securities Enforcement Branch (collectively, Plaintiffs) filed a civil complaint in federal court against Red Rock, its owner Sean Kelly, and Spencer. The Complaint sought injunctive and other equitable relief, and the imposition of civil penalties, for violations of the federal Commodity Exchange Act, 7 U.S.C. § 9(1) and CFTC Regulation 180.1, 17 C.F.R. § 180.1 as well as violations of state laws, including California Corporations Code sections 25230, 25235, and 29536.

4.       On _____, Spencer consented to entry of a Consent Order of Permanent Injunction and Other Statutory and Equitable Relief Against Defendants (Consent Order) to settle the matters alleged in the Complaint, and all amendments to the Complaint, without a trial on the merits.  The court approved the Consent Order on _____.

5.       Pursuant to the terms of the Consent Order, Spencer consented to the entry of this order barring Spencer. In signing the Consent Order, Spencer waived the filing of an accusation pursuant to Government Code sections 11415.40 and 11415.60, as well as the right to a hearing, any reconsideration, appeal, or other right to review provided by the CSL,  the California Administrative Procedure Act, the California Code of Civil Procedure, or any other provision of law.

NOW THEREFORE, GOOD CAUSE SHOWING, IT IS ORDERED that:

Anthony Charles Spencer is barred in the State of California from any position of employment, management, or control of any investment adviser, broker-dealer, or commodity adviser pursuant to California Corporations Code section 25232.1.

This Order is effective as of the date hereof.

Dated: March __, 2024           CLOTHILDE V. HEWLETT
       Los Angeles, California       Commissioner of Financial Protection and Innovation



By

_____
MARY ANN SMITH
Deputy Commissioner
Enforcement Division

2

ORDER BARRING ANTHONY CHARLES SPENCER PURSUANT TO CORPORATIONS CODE SECTION 25232.1

STATE OF HAWAII

DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS

| | |
|---|---|
| In the Matter of: | ) Case No. SEB20200080 |
| | ) |
| RED ROCK SECURED, LLC, SEAN L. | ) ORDER BARRING SEAN L. KELLY fka |
| KELLY fka SHADE L. KELLY-JOHNSON, | ) SHADE L. KELLY-JOHNSON |
| and ANTHONY SPENCER | ) |
| | ) |
| Respondents. | ) |
| | ) |

ORDER BARRING SEAN L. KELLY fka SHADE L. KELLY-JOHNSON

The Commissioner of Securities of the State of Hawaii ("Commissioner"), as administrator of Chapter 485A of the Hawaii Revised Statutes ("HRS"), known as the Uniform Securities Act (2002) (hereinafter the "Act"), has determined that it is necessary and appropriate in the public interest and for the protection of the investors to issue this Order, and hereby enters this Order, finding that:

1.      The Commissioner has jurisdiction over this matter pursuant to the Act.

2.      Sean L. Kelly fka Shade L. Kelly-Johnson ("Kelly") was the majority owner and sole manager of Red Rock Secured, LLC ("Red Rock").

3.      On May 15, 2023, the U.S. Commodity Futures Trading Commission, California Department of Financial Protection and Innovation, and State of Hawaii, Department of Commerce and Consumer Affairs, Securities Enforcement Branch filed a civil complaint ("Complaint") in the United States District Court for the Central District of California, designated as Case No. 2:23-CV-03680-RGK-PVC, against Red Rock, Kelly and Anthony Spencer alleging they engaged in fraud, in violation of the federal Commodity Exchange Act, as well various state laws, including HRS §§ 485A-501(a)(2) and 485A-603.5.  The Complaint sought injunctive relief, the imposition of civil penalties, and other equitable relief.

4.      On ⬚, Kelly and Red Rock consented to entry of a Consent Order of Permanent Injunction and Other Statutory and Equitable Relief Against Defendants ("Consent Order") to partially settle the matters alleged in the Complaint, and all amendments to the Complaint, without a trial on the merits.  The court approved the Consent Order on ⬚.

5.      Pursuant to the terms of the Consent Order, Kelly and Red Rock voluntarily consented to the entry of this Order barring Kelly.  In signing the Consent Order, Kelly waived any and all rights to a hearing or to otherwise challenge, request reconsideration of, or appeal the Consent Order pursuant to the Act or any other provision of law.

6.      This Order does not preclude the imposition of any sanction or other action against Kelly for future violations of the Act.

NOW THEREFORE, IT IS HEREBY ORDERED that:

Sean L. Kelly fka Shade L. Kelly-Johnson is PERMANENTLY BARRED from acting as an issuer, broker-dealer, agent, investment adviser and/or investment adviser representative in Hawaii and applying for registration in Hawaii as an issuer, broker-dealer, agent, investment adviser and/or investment adviser representative, and shall never serve in a position of employment, management, or control with or for any investment adviser, broker-dealer or issuer pursuant to the Act.

This Order is effective as of the date hereof.

DATED:  Honolulu, Hawaii _____.


_____
TY Y. NOHARA
Commissioner of Securities
Department of Commerce and Consumer Affairs
STATE OF HAWAII

STATE OF HAWAII

DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS

| In the Matter of: | ) | Case No. SEB20200080 |
|---|---|---|
| | ) | |
| RED ROCK SECURED, LLC, SEAN L. | ) | ORDER BARRING ANTHONY SPENCER |
| KELLY fka SHADE L. KELLY-JOHNSON, | ) | |
| and ANTHONY SPENCER | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

ORDER BARRING ANTHONY SPENCER

The Commissioner of Securities of the State of Hawaii ("Commissioner"), as

administrator of Chapter 485A of the Hawaii Revised Statutes ("HRS"), known as the Uniform

Securities Act (2002) (hereinafter the "Act"), has determined that it is necessary and appropriate

in the public interest and for the protection of the investors to issue this Order, and hereby enters

this Order, finding that:

1.      The Commissioner has jurisdiction over this matter pursuant to the Act.

2.      Anthony Spencer ("Spencer") was a Senior Account Executive at Red Rock

Secured, LLC ("Red Rock") at all relevant times herein.

3.      On May 15, 2023, the U.S. Commodity Futures Trading Commission, California

Department of Financial Protection and Innovation, and State of Hawaii, Department of

Commerce and Consumer Affairs, Securities Enforcement Branch filed a civil complaint

("Complaint") in the United States District Court for the Central District of California,

designated as Case No. 2:23-CV-03680-RGK-PVC, against Red Rock, Sean L. Kelly fka Shade

L. Kelly-Johnson, and Spencer, alleging they engaged in fraud, in violation of the federal

Commodity Exchange Act and various state laws, including HRS §§ 485A-501(a)(2) and 485A-

603.5.  The Complaint sought injunctive relief, the imposition of civil penalties, and other

equitable relief.

4.      On _____, Spencer consented to entry of a Consent Order of Permanent Injunction,

Civil Monetary Penalty, And Other Statutory And Equitable Relief Against All Defendants

("Consent Order") to settle the matters alleged in the Complaint, and all amendments to the

Complaint, without a trial on the merits.  The court approved the Consent Order on _____.

5.      Pursuant to the terms of the Consent Order, Spencer voluntarily consented to the

entry of this Order barring Spencer.  In signing the Consent Order, Spencer waived any and all

rights to a hearing or to otherwise challenge, request reconsideration of, or appeal the Consent

Order pursuant to the Act or any other provision of law.

6.      This Order does not preclude the imposition of any sanction or other action

against Spencer for future violations of the Act.

NOW THEREFORE, IT IS HEREBY ORDERED that:

Anthony Spencer is PERMANENTLY BARRED from acting as an issuer, broker-dealer,

agent, investment adviser and/or investment adviser representative in Hawaii and applying for

registration in Hawaii as an issuer, broker-dealer, agent, investment adviser and/or investment

adviser representative, and shall never serve in a position of employment, management, or

control with or for any investment adviser, broker-dealer or issuer pursuant to the Act.

This Order is effective as of the date hereof.

DATED:  Honolulu, Hawaii _____.


_____
TY Y. NOHARA
Commissioner of Securities
Department of Commerce and Consumer Affairs
STATE OF HAWAII